# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

JEFF KUSMIERSKI, Derivatively on Behalf
of Nominal Defendant NEXTERA ENERGY,
INC.,

|  |  |
|---|---|
| Plaintiff, | Case No. 1:24-cv-22533 |
| v. | Hon. Jacqueline Becerra, U.S.D.J. |

JOHN W. KETCHUM, NICOLE S.
ARNABOLDI, SHERRY S. BARRAT,
JAMES L. CAMAREN, KENNETH B.        **JURY TRIAL DEMANDED**
DUNN, NAREN GURSAHANEY, KIRK S.
HACHIGIAN, AMY B. LANE, DAVID
PORGES, JOHN A. STALL, DARRYL L.
WILSON, RUDY E. SCHUPP, JOHN L.
SKOLDS, LYNN M. UTTER, JAMES L.
ROBO, ERIC SILAGY, DAVID P.
REUTER, and MATRIX LLC,

Defendants,

- and -

NEXTERA ENERGY, INC.,

Nominal Defendant.

_____/

## VERIFIED STOCKHOLDER AMENDED DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................................... 6

III.    PARTIES ....................................................................................................................... 7

        A.      Plaintiff ............................................................................................................. 7

        B.      Nominal Defendant ........................................................................................... 7

        C.      Current Director Defendants ............................................................................. 7

        D.      Former Director and Executive Defendants ..................................................... 9

        E.      Aiding and Abetting Defendant ...................................................................... 11

IV.     THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS ..................... 11

        A.      Duties of All Individual Defendants ............................................................... 11

V.      SUBSTANTIVE ALLEGATIONS ............................................................................ 20

        A.      Background ..................................................................................................... 20

        B.      NextEra's Anti-Competitive Behavior and Undisclosed Participation in
                Political Processes .......................................................................................... 22

                1.      NextEra's Obstruction of a Competitor's Energy Project in New
                        England ................................................................................................ 22

                2.      NextEra's Hidden Funding to Undermine New England Clean
                        Energy Connect .................................................................................... 25

                3.      Under-the-Table Political Influence Peddling in Florida ..................... 31

                        a.      FPL's Failed Effort to Buy the Jacksonville Electric
                                Authority ................................................................................... 35

                                i.      Matrix Extended a Phony Job Offer at "Grow
                                        United" to a Jacksonville City Councilor to Try to
                                        Get Him Out of the Way ................................................. 37

                                ii.     FPL's VP of State Legislative Affairs, Daniel
                                        Martell, Was Contemporaneously Aware of
                                        Matrix's Covert Surveillance of a Journalist ................. 40

                        b.      FPL and Matrix Orchestrate the "Ghost Candidate" Scheme ....... 43

           i.      Spoiler Candidates in the 2018 Election Cycle State Senate District 8 ................................................................ 43

           ii.     Commission District 8 of Miami-Dade County ............... 50

           iii.    Ghost Candidates in the 2020 Election Cycle .................. 54

       c.    Matrix and FPL Established and Funded the Ghost Candidates' Funding Structure ......................................... 57

       d.    The 2020 Funding Structure for FPL's Spending with Matrix Was Designed to Evade Detection .......................... 73

       e.    Silagy Used Matrix to Gain Covert Control of an "Independent" News Website that FPL Used to Attack Competitors .................................................................... 76

    4.    Media Outlets Start Reporting on FPL's Ties to Matrix and the Ghost Candidate Scheme ....................................................... 85

  C.    Defendants' Violations of Securities Laws ............................................ 86

    1.    Affirmative Misstatements ........................................................ 87

    2.    Omissions in SEC Filings ......................................................... 89

    3.    The Truth Emerges and Subsequent Developments ................................ 91

    4.    Securities Damages to NextEra ................................................. 95

VI.    BOARD KNOWLEDGE AND CULPABILITY ............................................. 96

VII.    DAMAGES TO THE COMPANY ............................................................ 103

VIII.    DERIVATIVE ALLEGATIONS ............................................................ 103

IX.    DEMAND FUTILITY ALLEGATIONS ..................................................... 104

X.    CLAIMS FOR RELIEF ...................................................................... 106

    COUNT I .................................................................................. 106

    COUNT II ................................................................................. 107

    COUNT III ................................................................................ 109

    COUNT IV ................................................................................ 110

    COUNT V ................................................................................. 112

XI.    PRAYER FOR RELIEF ..................................................................... 112

XII.    JURY DEMAND ............................................................................ 113

Plaintiff Jeff Kusmierski ("Plaintiff"), by and through his undersigned counsel, brings this action derivatively on behalf of Nominal Defendant NextEra Energy, Inc. ("NextEra," or the "Company"), against certain current and former members of NextEra's Board of Directors (the "Board") and executive officers, seeking to remedy (1) breaches of fiduciary duties and (2) violations of the federal securities laws.  Plaintiff makes these allegations upon personal knowledge as to the facts of his ownership of NextEra stock and upon information and belief as to all other matters, based upon an investigation by his counsel, which included, among other things, a review of: (a) non-public internal Company records obtained by Plaintiff pursuant to Florida Statutes §607.1602 (the "Books and Records"); (b) public filings made by NextEra and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by the Company and other related non-parties; (d) news articles, shareholder communications, and postings on NextEra's website; (e) the proceedings in a related federal securities class action captioned *Jastram v. NextEra Energy, Inc.*, No. 9:23-cv-80833-AMC (S.D. Fla.) (the "Securities Action"); (f) the proceedings in a related civil suit captioned *Avangrid, Inc. v. NextEra Energy, Inc.*, No. 3:24-cv-30141-KAR (D. Mass.) ( the "Antitrust Action"); and (g) other publicly available information.

## I.     NATURE OF THE ACTION

1.     NextEra is one of the largest energy and utility holding companies in North America.  NextEra's main subsidiary is Florida Power and Light Co. ("FPL"), the largest vertically integrated regulated utility in Florida.

2.     NextEra and its subsidiaries operate in a highly regulated industry, and are dependent on local, state, and federal lawmakers to set the rules under which NextEra operates and

makes money.  As such, NextEra regularly spends significant sums on lobbyists and political consultants to advocate for NextEra's interests.

3.      NextEra's dependence on lawmakers also gives the Company a motivation to work to ensure that its preferred candidates for office are promoted, and that its preferred policies are enacted.  Operating in this political environment means that the Company is bound by federal, state, and local election laws and regulations.  Federal and state laws also prohibit NextEra from using its market position to operate in an anticompetitive fashion.  In addition, the Company and its leadership are bound by NextEra's own policies and guidelines on how to operate ethically and legally in that environment.  As a publicly traded company, NextEra and its leadership are further bound by SEC rules and regulations not to issue materially false and misleading statements about the Company.

4.      ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████

5.      ██████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████. Later media reports alleged that Matrix had spied on journalists with the active participation of FPL employees after the publication of negative reporting.

6.      NextEra responded to reports of its alleged involvement in any potential scandal by denying any such involvement.  For example, on December 2, 2021, in response to an *Orlando Sentinel* story, NextEra's corporate spokesperson, Defendant David P. Reuter ("Reuter") stated that "[a]ny report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false."

7.      Defendant James L. Robo ("Robo"), NextEra's then-Chief Executive Officer ("CEO") and Board Chairman, addressed the controversy during a conference call with stock market analysts and investors on January 25, 2022, stating that NextEra had "conducted a very extensive and thorough investigation that included looking at company financial records.  It included looking at everyone who was named in its company e-mails, also looking at their – they've all provided access to their personal e-mails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all [. . .] I feel very good that there is no basis to any of these allegations[.]"

8.      Defendants' statements denying any connection with the publicly reported allegations of possible wrongdoing were materially false and misleading when made.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

3

███████████████████████████████████████████████

████████████████████████████████████

9.      ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

10.     The Matrix Memo and its supporting exhibits and associated documents describe, in detail, that (1) Matrix specifically outlined for FPL executives how it would use a series of 501(c)(4) and other entities controlled by its operatives or affiliates to conceal FPL's political expenditures for the 2020 election cycle; (2) FPL executives, including Silagy, approved and orchestrated the selection of which elected officials should be the subject of FPL's concealed political expenditures; and (3) FPL funds flowed through a series of intermediaries to dark money groups and vendors responsible for recruiting or bolstering the "ghost candidates" who served as spoilers in the 2020 election.

11.     By denying any involvement in the Matrix scheme, and by claiming that there was no basis for potential liability, Robo, Silagy, and Reuter – and thus NextEra itself – violated federal securities laws, as well as NextEra's own policies.

12.     A separate NextEra subsidiary, NextEra Energy Resources, LLC ("NEER"), participated in a similar scheme in Maine at the same time as the Matrix-FPL scheme was underway.  Likewise steering Company funds through a series of 501(c)(4) groups, NextEra sought

to influence the progress of a major transmission line called New England Clean Energy Connect ("NECEC"). An investigation by Maine's elections regulator resulted in findings of wrongdoing by the groups funded by NEER. NextEra further engaged in anticompetitive conduct in seeking to derail NECEC by introducing two unconstitutional referendums, engaging in the dark-money scheme, and obstructing infrastructure improvements.

13. Individual Defendants (defined *infra*) violated their fiduciary duties to NextEra and its shareholders and violated federal securities laws by actively participating in the FPL-Matrix and NECEC schemes, by putting out, or allowing NextEra to put out, false and misleading statements to the market about the schemes, or by failing to adequately establish and monitor internal controls to prevent, detect, or adequately deal with the wrongdoing and wrongdoers.

14. 

. As a result of the Individual Defendants' breach of fiduciary duty, NextEra and its shareholders have suffered financial and reputational harm. The Company is subject to potentially hundreds of millions of dollars in liability from the Securities Action and the Antitrust Action. Repeated media campaigns have tarnished the Company's reputation. Individual Defendants were unjustly enriched despite their breaches of duty. This action seeks to obtain redress on behalf of NextEra and its shareholders for those harms.

## II.      JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331.  The claims asserted herein arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78cc(b), and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.  In connection with the wrongdoing complained of herein, defendants used the means and instrumentalities of interstate commerce, the U.S. mail, and the facilities of the national securities markets.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each of the defendants named herein because each defendant is either a corporation incorporated, maintaining its principal executive offices, and operating in this State, or is an individual who is a citizen of this State or has sufficient minimum contacts with this State so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Venue is proper pursuant to 28 U.S.C. §1391(b) because: (i) the Company is headquartered in this District; (ii) one or more of the Individual Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### III.   PARTIES

#### A.   Plaintiff

18.     Plaintiff Jeff Kusmierski is a shareholder of NextEra.  Plaintiff initially purchased shares on May 5, 2022, and has continuously held his shares since then.  Plaintiff will continue to hold NextEra shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of other NextEra shareholders in enforcing the rights of the Company.

#### B.   Nominal Defendant

19.     Nominal Defendant NextEra is a Florida corporation with its principal executive offices located at 700 Universe Boulevard, Juno Beach, Florida 33408.

#### C.   Current Director Defendants

20.     Defendant John W. Ketchum ("Ketchum") has served as the President and CEO of NextEra since March 2022, its Chairman since July 2022, and Chairman of FPL since February 2023.  From March 2019 until March 2022, Mr. Ketchum served as the President and CEO of NEER.  Previously, Mr. Ketchum served as executive Vice President, Finance, and Chief Financial Officer of NextEra from March 2016 to March 2019.  Defendant Ketchum is the Chair of the Board's Executive Committee and a member of the Board's Nuclear Committee.

21.     Defendant Nicole S. Arnaboldi ("Arnaboldi") has been a director of NextEra since October 2022.  Defendant Arnaboldi is a member of the Board's Audit and Finance and Investment Committees.

22.     Defendant James L. Camaren ("Camaren") has been a director of NextEra since 2002.  Defendant Camaren is a member of the Board's Compensation and Finance and Investment committees.

23.     Defendant Naren Gursahaney ("Gursahaney") has been a director of NextEra since 2014.  Defendant Gursahaney is the Chair of the Board's Audit Committee and a member of the Board's Executive and Governance and Nominating committees.

24.     Defendant Kirk S. Hachigian ("Hachigian") has been a director of NextEra since 2013.  Defendant Hachigian is the Chair of the Board's Compensation Committee and a member of the Board's Executive and Governance and Nominating committees.

25.     Defendant Amy B. Lane ("Lane") has been a director of NextEra since 2015.  Defendant Lane is the Chair of the Board's Governance and Nominating Committee and a member of the Board's Executive and Finance and Investment committees.

26.     Defendant David Porges ("Porges") has been a director of NextEra since 2020.  Defendant Porges is the Chair of the Board's Finance and Investment Committee and a member of the Board's Executive and Governance and Nominating committees.

27.     Defendant John A. Stall ("Stall") retired from NextEra in 2010, where he had served in numerous nuclear leadership roles.  Defendant Stall served as President of NextEra's nuclear division from 2009 to 2010, as Senior Vice President and Chief Nuclear Officer from 2001 to 2009, as Vice President, Nuclear Engineering from 2000 to 2001 and Vice President of NextEra's St. Lucie nuclear generating station from 1996 to 2000.  Defendant Stall has been a director of NextEra since 2022.  Defendant Stall chairs the Board's Nuclear Committee and is a member of the Board's Audit Committee.

28.     Defendant Darryl L. Wilson ("Wilson") has been a director of NextEra since 2018.  Defendant Wilson serves on the Board's Audit and Compensation committees.

29.     Defendants Ketchum, Arnaboldi, Camaren, Gursahaney, Hachigian, Lane, Porges, Stall, and Wilson are collectively referred to herein as the "Current Director Defendants."[1]

### D.     Former Director and Executive Defendants

30.     Defendant James L. Robo ("Robo") served as President and CEO of NextEra from July 2012, as Chairman of NextEra from December 2013, and as Chairman of FPL from May 2012, until his retirement in March 2022.  Prior to his succession to the role of CEO, he served as President and Chief Operating Officer of NextEra from 2006.  Robo joined NextEra as Vice President of corporate development and strategy in March 2002 and became President of NEER later in 2002.  Robo was also chairman of the board and CEO of NextEra Energy Partners, LP.  He served as the chair of the Executive Committee.

31.     Defendant Sherry S. Barrat ("Barrat") served as director of NextEra from 1998 until 2024.  Defendant Barrat was a member of the Board's Compensation, Executive, and Governance and Nominating Committees, and served as Lead Independent Director.

32.     Defendant Kenneth B. Dunn ("Dunn") served as director of NextEra from 2010 until 2024.  Defendant Dunn was a member of the Board's Audit and Finance and Investment committees.

33.     Defendant Rudy E. Schupp ("Schupp") served as director of NextEra from 2005 until 2023 and served as the chair of Governance and Nominating Committee as well as a member of the Executive and Compensation Committees.

34.     Defendant John L. Skolds ("Skolds") served as a director of NextEra from 2012 until 2023 and served as the chair of the Nuclear Committee and a member of the Audit Committee.

---

[1]     Current NextEra directors Maria Henry, Geoffrey Martha, and Dev Stahlkopf are not named as defendants in this action.

35.     Lynn M. Utter ("Utter") served as a director of NextEra from November 2021 until May 2022 and served as a member of the Audit Committee and Finance & Investment Committee.

36.     Defendants Robo, Barrat, Dunn, Schupp, Skolds, and Utter are collectively referred to as the "Former Director Defendants," and with the Current Director Defendants as the "Director Defendants."

37.     Defendant Eric Silagy served as President, CEO, and Chairman of FPL.  Defendant Silagy was appointed president in December 2011, CEO in May 2014, and Chairman in March 2022.  Defendant Silagy retired from FPL in May 2023.

38.     Defendant David P. Reuter has been NextEra's Vice President & Chief Communications Officer and has served as the primary corporate spokesperson for NextEra and FPL, since 2018.  Reuter, because of his position in the Company, possessed the authority to control the contents of the Company's press releases and statements to journalists.

39.     Defendants Robo, Silagy, and Reuter are collectively referred to herein as the "Officer Defendants."  Robo, Silagy, and Reuter made or controlled the Company's statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, non-public information available to them, Robo, Silagy, and Reuter knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

40.     The Officer Defendants and Director Defendants are collectively referred to herein as the "Individual Defendants."

### E.   Aiding and Abetting Defendant

41.   Matrix LLC is a political consulting, lobbying, opposition research, and strategic communications firm headquartered in Montgomery, Alabama, and founded by Dr. Joseph Perkins ("Perkins").

## IV.   THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### A.   Duties of All Individual Defendants

42.   By reason of their positions as directors and officers of NextEra, and by virtue of their ability to control the business and corporate affairs of the Company, each of the Individual Defendants owed, and owes, NextEra and its shareholders the fiduciary obligations of loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of NextEra and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

43.   Each Individual Defendant owes to NextEra and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.   At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants, and of the Company, and was at all times acting within the course and scope of such agency.

45.   By virtue of their fiduciary duties of loyalty, good faith, and candor, each Individual Defendant was required to, among other things:

> a.   Exercise good faith to ensure that NextEra's affairs were conducted in an efficient, business-like manner;

      b.     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

      d.     Remain informed as to how the Company conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

46.     The Director Defendants who were and are members of the committees of the Board, assumed the responsibility to carry out the functions of their committees.

47.     The Individual Defendants knowingly or consciously breached their fiduciary duties of loyalty and good faith.  They did so by causing themselves or allowing other Individual Defendants to cause NextEra to engage in political misconduct and violate federal securities laws. This misconduct has caused NextEra to be damaged both financially and reputationally.

48.     Furthermore, by virtue of their positions of control and authority as directors and/or officers of NextEra, the Individual Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent other of the Individual Defendants from their misconduct.

49.     The Company's Political Engagement Policy states, in relevant part, the following:

> NextEra Energy officers with accountability for political engagement report to senior management of the Company, which includes the Chairman and Chief Executive Officer of NextEra Energy. Senior management provides oversight of

the Company's political engagement activities and ensures they are in alignment with the Company's corporate strategy and objectives[. . . .]

NextEra Energy sets high ethical standards when making corporate political contribution decisions[. . . .]  NextEra Energy makes each political contribution with the expectation that it is in full compliance with both the letter and the spirit of the law of the applicable jurisdiction.

* * *

***The Governance & Nominating Committee of the NextEra Energy Board of Directors assists the Board in oversight of the Company's political activities.*** The Governance & Nominating Committee reviews and discusses with NextEra Energy's Executive Vice President and General Counsel, at least annually, the Company's Significant Trade Association Dues, contributions by the NextEra Energy PAC, the Company's contributions to candidates and committees and the Company's contributions to all U.S. tax-exempt organizations that are primarily engaged in political activities.

The Governance & Nominating Committee also periodically reviews and discusses this policy with management, and is required to approve any changes to this policy.

**Public Disclosures**

As part of the Company's political engagement policy, the Company commits to publicly disclose on its website, within 180 days after the end of each calendar year, its annual Significant Trade Association Dues, its expenditures for federal and state lobbying, and contributions from the NextEra Energy PAC, among other pertinent information.

50.     NextEra's Code of Business Conduct and Ethics (the "Code of Conduct") applies

to everyone at NextEra, including the Individual Defendants.

51.     The Code of Conduct states:

Violations of our Code, values, policies or the law will carry serious consequences for the individuals involved, as well as for NextEra Energy as a whole. Those individuals engaging in unethical or illegal behavior and those who direct, condone, approve, or facilitate such behavior, will be subject to legal action and disciplinary action, up to and including termination. Behavior prohibited under the Code puts all of us at risk of a damaged reputation, negatively affects our stakeholders and may subject us to fines and civil or criminal liability.

52.     In a section titled "Investigations and Consequences," the Code of Conduct states,

in relevant part:

13

NextEra Energy strives to apply consistent principles when conducting investigations. When a concern is reported, the information is forwarded to the proper resource for investigation. Those who make reports to the Code of Business Conduct & Ethics Hotline will receive a case number. This number enables you to check on the status of the investigation. You may be asked to provide additional information and will be notified when an investigation is completed. This is all done to the extent practicable under the circumstances.

53.     In a section titled "Legal Responsibilities," the Code of Conduct states, in relevant part:

Regardless of title, position or tenure, you have a duty to know and strictly follow our Code, the law, and all Company policies. Additionally, you must know and follow the laws and regulations that apply to the work you do and the places where we do business – whether working in or outside of the United States. When you are unclear about the meaning or importance of a section of our Code, you should not hesitate to ask questions. Note, you must certify, on an annual basis, that you have read and understand our Code. Compliance with our Code is non-negotiable.

54.     In a section titled "We Observe Securities Laws," the Code of Conduct states, in relevant part:

In the course of your work, you may become aware of information about our Company (or other companies) before the public hears about it. It is important that you never disclose, or use for your personal benefit, any material, non-public (or "inside") information you know or possess. Material, non-public information comes in various forms. Generally, it is information that a reasonable investor would consider important when making an investment decision, like buying or selling stock. Alternatively, you might not think of information as "public" until after the close of business on the first trading day following the date of public disclosure of the information. Trading on material, non-public information is a violation of insider trading laws, which can subject the individuals involved to disciplinary action up to and including termination, as well as to potential civil and criminal penalties.

55.     In a section titled "Personal Relationships," the Code of Conduct states, in relevant part:

A conflict of interest can arise if you or any related person has a personal stake in a company that is a customer, business partner, or a competitor of NextEra Energy[. . . .] **Personal relationships include a relative or related person, such as your spouse, civil partner, parents, children, siblings, stepparents, mothers-in-law and fathers-in-law, sons-in-law and daughters-in-law, any person living in the**

14

**same house with you, any business associate of yours and anyone who is a close personal friend of yours.**

[Emphasis in original.]

56.    In a section titled "We Exchange Business Courtesies Ethically," the Code of Conduct states, in relevant part:

At NextEra Energy, we win business based on the quality of our offerings – not our ability to be swayed by business courtesies or favors. To preserve our good reputation, you must use caution when giving or accepting gifts or entertainment. You should not exchange business courtesies with an existing or potential supplier, contractor, vendor, business partner, or customer if the intent is to elicit an unfair business advantage for NextEra Energy.

**Gifts are usually goods and services but can be defined as any item of value. For example, when the person offering a meal or entertainment is not attending the meal or event, it is considered a gift.**

**Entertainment is generally defined as a situation where both a representative from the provider and the recipient are present.**

[Emphasis in original.]

57.    In a section titled "We Do Not Resort to Corruption or Bribery," the Code of Conduct states, in relevant part:

As part of our commitment to winning business the right way, NextEra Energy will never tolerate bribery in any form. Even if we lose business or encounter delays because of our refusal to do so, we will never bribe any third party, or allow or condone third parties to do so on behalf of NextEra Energy. We believe in ethically winning business through the quality of our products and services, never through bribery. We abide by laws, treaties and regulations that forbid bribery, including the U.S. foreign Corrupt Practices Act. To be a responsible member of our business community, you must follow these laws wherever you do business, regardless of local law or custom.

***It is also important to note that you may not hire a third party to do something that you cannot ethically or legally do yourself.***

[Emphasis added.]

58.    The Code of Conduct states further that:

15

You are encouraged to participate in political activities. You have the right to individually and voluntarily donate your time and money to the political process. However, your participation may not occur on Company time or at NextEra Energy's expense. This means, for example, that you should never engage with your fellow employees on behalf of a political candidate during the workday or expect to be reimbursed by our Company for your personal political contributions. If you want to use Company property, facilities, time or funds for political activities, it must be pre-approved as set forth in the table at the end of this section. **You must not engage in lobbying activities on behalf of NextEra Energy, without prior consent from the applicable Vice President according to the table that follows. Further, lobbying activities may require disclosure and may be subject to specific rules that are often complicated and subject to change. It is your responsibility to ensure that you are in compliance with the applicable laws.**

**In most – if not all – states and countries, it is illegal to make contributions or give gifts to politicians, political parties or public officials that are intended to influence official actions. Moreover, among other requirements, any political contributions of corporate funds or other assets must be made directly and in the name of our Company, promote the interests of our Company, be made without regard for private political preferences, comply with all applicable Company policies, be reported in compliance with applicable laws, recorded appropriately in our Company's books and records and be approved by the appropriate officers[.]**

[Emphasis added.]

59.     In a section titled "We Communicate Truthfully With The Public," the Code of

Conduct states, in relevant part:

**We always communicate truthfully with the public.** At the same time, we are consistent in our messaging and careful to promote our Company's best interests. For this reason, only authorized individuals can speak with the media on NextEra Energy's behalf.

60.     In a section titled "We Compete With Integrity," the Code of Conduct states, in

relevant part:

**We never sacrifice our integrity to win business.** This means **we comply with all applicable antitrust and competition laws, wherever we do business.** While complex, these laws are meant to ensure a level-playing field and fair competition in the marketplace. In practice, these laws require that we make independent business decisions, never engaging in unfair business practices, scheming with our competitors or making other inappropriate business arrangements.

[Emphasis added.]

16

61.     The Company's Code of Ethics for Senior Executive and Financial Officers applies to NextEra's Chairman, President, and CEO; Executive Vice President, Finance and Chief Financial Officer; Treasurer; Chief Tax Officer; Executive Vice President & General Counsel; Vice President, Controller and Chief Accounting Officer; the President and CEO of NEER; and the President and CEO of FPL; designating these persons collectively as the "Senior Executive and Financial Officers."  It provides, in relevant part:

> *You are expected to comply with both the letter and spirit of all applicable governmental laws, rules and regulations and this Code*, and to promptly report any suspected violations of applicable governmental laws, rules and regulations or this Code to the General Counsel, the Chief Executive Officer or the chairperson of the Audit Committee of NextEra Energy's Board of Directors. No one will be subject to retaliation because of a good faith report of a suspected violation. *If you fail to comply with this Code or any applicable laws, rules or regulations, you may be subject to disciplinary measures, up to and including termination of your employment.*

[Emphasis added.]

62.     The Company's Audit Committee Charter provides in relevant part:

> The Audit Committee is appointed by the Board of Directors of NextEra Energy, Inc. (the "Board") to assist the Board in its oversight of: (1) the integrity of the financial statements of the Company; (2) the independent auditor's qualifications and independence; (3) the performance of the Company's internal audit function and independent auditor; (4) the compliance by the Company with legal and regulatory requirements; and (5) the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

> In addition, the Committee shall prepare the report required by the rules of the Securities and Exchange Commission . . . to be included in the Company's annual proxy statement.

***

> *The function of the Committee is oversight.* The management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements and for the effectiveness of internal control over financial reporting. Management is responsible for designing and maintaining policies and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The internal audit department is responsible for

assessing the adequacy and effectiveness of the Company's system of internal controls, which are the responsibility of management. The independent auditors are responsible for planning and carrying out a proper audit of the Company's annual financial statements in accordance with generally accepted accounting principles, performing reviews of the Company's quarterly financial statements prior to the filing of each quarterly report on Form 10-Q, annually providing an opinion on the effectiveness of internal control over financial reporting, and other procedures.

\*\*\*

The Committee, to the extent required or as it deems appropriate, will:

<u>Financial Statement and Disclosure Matters</u>

\*\*\*

- Review and discuss with management and the independent auditor management's internal control report required to be included in the Company's annual report on Form 10-K, management's assessment of the internal control structure and procedures of the Company for financial reporting, and the independent auditor's opinion on the effectiveness of the Company's internal control over financial reporting.
- Afford the chief financial officer and chief accounting officer open lines of communication to the Committee.

\*\*\*

- Discuss with management and the independent auditor the effect of regulatory and accounting initiatives on the Company's financial statements.
- Discuss with management and the independent auditor the effect of off-balance sheet structures on the Company's financial statements.
- Discuss with management the Company's policies with respect to risk assessment and risk management.
- Review and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.
- Ensure that risks identified from time to time as major risks are reviewed by the Board or a Board Committee.

\*\*\*

- Review disclosures made to the Committee about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

\*\*\*

18

Compliance Oversight Responsibilities

- Afford the individual or individuals with operational responsibility for the compliance and ethics program an open line of communication to the Committee, including the authority to communicate to the Committee (1) promptly on any matter involving criminal conduct or potential criminal conduct, and (2) no less than annually on the implementation and effectiveness of the compliance and ethics program.
- Review management reports with respect to the conformity of the Company and its affiliated entities with applicable legal and regulatory requirements. Review compliance with the Company's Code of Business Conduct & Ethics and with the Code of Ethics for Senior Executive and Financial Officers, including review of any violations and waivers of such codes of ethics.
- Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.
- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.
- Discuss with the Company's General Counsel legal matters that the General Counsel believes are reasonably possible to have a material impact on the Company's financial statements, internal controls or compliance policies.

63.    The Company's Governance and Nominating Committee Charter provides in

relevant part:

The Committee's purposes include to: (1) identify individuals qualified to become Board members, consistent with criteria approved by the Board, and recommend that the Board select the director nominees for the next annual meeting of shareholders; (2) **take a leadership role in shaping NextEra Energy's corporate governance policies and practices, including recommending to the Board the Corporate Governance Principles & Guidelines applicable to NextEra Energy and its subsidiaries** (the "Company"); and (3) oversee the evaluation of the Board.

\*\*\*

Authority and Responsibilities

- Develop and recommend to the Board a set of Corporate Governance Principles & Guidelines applicable to the Company. Periodically review the Corporate Governance Principles & Guidelines and recommend any proposed changes to the Board.

- Review and assess the adequacy of the Company's Code of Business Conduct & Ethics and its Code of Ethics for Senior Executive and Financial Officers and recommend any proposed changes to the Board.
- Perform any other governance or similar activities as the Committee deems appropriate, or as are requested or may be delegated by the Board, consistent with this Charter, the Company's Bylaws and applicable laws and regulations.

[Emphasis added.]

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

64.     NextEra is one of the largest energy and utility holding companies in North America.  NextEra produced revenue of over $18 billion in 2020 and employs approximately 14,900 employees throughout the United States and Canada.

65.     FPL delivers rate-regulated electricity to over 10 million people across nearly half of the State of Florida and is considered the third largest electric utility company in the United States.

66.     NEER is the world's largest producer of renewable energy from wind and solar.

67.     NextEra is entirely dependent on FPL and NEER for its corporate revenues.  In the most recent Form 10-K jointly filed by NextEra and FPL on February 16, 2024, NextEra reported fiscal year 2023 operating revenues of $28.114 billion.  FPL accounted for $18.365 billion of those revenues (65.3%), while NEER accounted for $9.672 billion (34.4%), thus combining for 99.7% of NextEra's operating revenues.

68.     The three entities share resources, as well as senior management.  For example, Defendant Ketchum, in addition to serving as NextEra's CEO, President, and Chairman, concurrently serves as FPL's CEO, and previously served as President and CEO of NEER. Defendant Robo likewise was NextEra's Chairman, President, and CEO while concurrently serving as FPL's Chairman, and had previously served as President of NEER.

69.     NextEra and its operating subsidiaries do business in a highly regulated environment.  FPL is a rate-regulated utility provider, overseen by numerous state and federal regulators, including the Florida Public Service Commission ("FPSC"); the U.S. Federal Energy Regulatory Commission ("FERC"), the North American Electric Reliability Corporation ("NERC"), the U.S. Nuclear Regulatory Commission ("NRC"), and the U.S. Environmental Protection Agency ("EPA").  NEER has ownership interests in rate-regulated transmission facilities which are regulated by state/provincial and federal regulators in Texas, California, New York, and Ontario, among others.

70.     Most notably, the FPSC is responsible for much of FPL's operating parameters, including retail rates, service area, issuance of securities, and planning, siting, and construction of facilities.

71.     Each of the FPSC's five commissioners is appointed by the Governor of Florida and confirmed by the Florida Senate.

72.     Given NextEra's dependence on decisions made by politically appointed regulators such as the FPSC, it is not surprising that NextEra spends significant sums on lobbying and other expenditures on the political process.  According to figures published by the Energy and Policy Institute, FPL spent over $8.1 million on state-level campaign funds and political committees in the 2018 Florida gubernatorial cycle, $5.1 million in the 2020 cycle, and had already spent $6 million with two months to go in the 2022 cycle.[2]  According to the watchdog organization OpenSecrets, NextEra and its political action committees, individual members/employees and

---

[2]     Alissa Jean Schafer, *Amid Connections to Ongoing Election Scandals, NextEra Pours Millions into Florida's 2022 Election Cycle*, ENERGY AND POLICY INST. (Sept. 8, 2022), https://energyandpolicy.org/nextera-pours-millions-into-floridas-2022-election-cycle/.

their families have contributed over $22 million to political campaigns since 1990 and over $87 million in lobbying efforts since 1998.[3]

## B. NextEra's Anti-Competitive Behavior and Undisclosed Participation in Political Processes

73.     NextEra has engaged in a series of undisclosed political spending designed to advance its interests outside of the public eye, notably through the hidden funding of 501(c)(4) organizations, which did NextEra's bidding, unbeknownst to the public.

74.     At the same time, NextEra used its market power and influence to prevent, obstruct, and delay its competitors' business activities, costing those businesses and consumers millions of dollars.

### 1. NextEra's Obstruction of a Competitor's Energy Project in New England

75.     NextEra has spent years fighting construction of a transmission line in Maine called New England Clean Energy Connect (NECEC).  In 2017, Massachusetts engaged Avangrid, Inc. ("Avangrid") – a competitor of NextEra – to develop NECEC from the Canadian border to Lewiston, Maine, where power from hydroelectric facilities in Quebec would enter the regional power grid.  Avangrid's project represented an additional power source for the region, threatening NextEra's market share and profits.

76.     At every step of the way, NextEra abused the regulatory, ballot initiative, and courtroom processes in an effort to obstruct the construction and implementation of NECEC.

77.     NECEC required various state and federal permits and approvals from agencies including the Massachusetts Department of Public Utilities ("DPU"), Maine Department of

---

[3]     *Client Profile: NextEra Energy*, OPEN SECRETS, https://www.opensecrets.org/federal-lobbying/clients/summary?id=D000000321 (last visited May 16, 2024).

Environmental Protection ("DEP"), and Maine Public Utilities Commission ("PUC"). In order to slow down the permitting process, NextEra unsuccessfully intervened in all three regulatory proceedings to oppose NECEC. NextEra then took unsuccessful appeals of each regulatory decision.

78.    Having exhausted the permitting process as a delay tactic, NextEra next turned to the ballot box, backing two unconstitutional referendums in Maine meant to deny or further delay the implementation of NECEC.

79.    During the summer of 2019, after the PUC had issued a certificate of public convenience and necessity for NECEC, NextEra reviewed the language of a referendum which, if approved, would compel the PUC to reverse the certificate.  Avangrid successfully challenged the initiative in the Maine Supreme Judicial Court as an unconstitutional end run around Maine's guaranteed separation of powers.[4]

80.    After the first unconstitutional ballot referendum, NextEra worked to get a second referendum on the ballot in November 2021, revoking NECEC's certification by preventing construction of transmission lines like NECEC in the Upper Kennebec Region – with retroactive effect. After the referendum passed, Avangrid successfully challenged it in the Maine Supreme Judicial Court as an unconstitutional violation of NECEC's due process rights under the vested rights doctrine.[5]  Separately, the Maine Supreme Judicial Court found the second referendum also unlawfully targeted NECEC, saying: "Opponents have swapped a targeted directive in the first

---

[4]      *Avangrid Networks, Inc. v. Sec'y of State*, 237 A.3d 882, 885, 895 (Me. 2020).

[5]      *NECEC Transmission LLC v. Bureau of Parks & Lands*, 281 A.3d 618, 630 (Me. 2022).

initiative for a nominally nontargeted retroactive mandate in the one before us now."[6]  With the court's holdings in hand, NECEC ultimately was allowed to continue construction.

81.     NextEra still held another card in its hand to delay or deny NECEC and continue its bottleneck monopoly, however.

82.     Even after NECEC was constructed, it needed increased capacity at the NextEra-owned Seabrook Station circuit breaker (the "Seabrook Breaker") in order for its energy to flow into the grid.

83.     ISO New England, which operates the regional power grid, had determined that the Seabrook Breaker was already operating at 99.6% capacity, and would require an upgrade before NECEC could connect to the grid without risking a catastrophic short circuit.

84.     Under the terms of the regional power operating contract (known as a "tariff"), Avangrid – not NextEra – would be responsible for the direct costs of upgrading the Seabrook Breaker. Despite proposing to undertake construction on the Seabrook Breaker upgrade during planned downtime at Seabrook Station, NextEra refused to allow Avangrid to upgrade the Seabrook Breaker unless Avangrid promised to reimburse NextEra for all its ***indirect*** costs associated with the construction – including legal costs and lost profits.

85.     The parties brought the dispute to FERC, which ruled largely in favor of Avangrid. NextEra petitioned the D.C. Circuit Court of Appeals for review.  In a hearing before the court, NextEra openly bragged about its "veto" power over Avangrid – and any other potential competitor – to connect new power to the regional grid. The court found that NextEra's position – "that its refusal to upgrade the breaker would prevent new generators from joining the grid and thus ensure that the breaker remains adequate" – was "anti-competitive behavior" incompatible

---

[6]     *Black v. Bureau of Parks & Lands*, 288 A.3d 346, 364 n.13 (Me. 2022).

with "good business practices" as required under NextEra's legal obligations.[7]   The court thus

affirmed the FERC order. NextEra finally completed the Seabrook Breaker upgrade in November

2024 – after over five years of fruitless obstructionism by NextEra.

86.     As a result of the above, Avangrid filed the Antitrust Action in November 2024,

seeking over $350 million in damages from NextEra.

### 2.     NextEra's Hidden Funding to Undermine New England Clean Energy Connect

87.     As part of its anticompetitive efforts to thwart NECEC, NEER surreptitiously

funneled cash through a series of unrelated 501(c)(4) entities to support the planned 2020 citizen

initiative in Maine to oppose NECEC.  After a multi-year investigation into alleged wrongdoing,

the Maine Commission on Governmental Ethics and Election Practices entered into consent orders

with two of those entities for violations of Maine campaign finance laws.

88.     Bernstein, Shur, Sawyer & Nelson, P.A. ("Bernstein Shur"), is a Maine law firm.[8]

89.     The Hawthorn Group, L.C. ("Hawthorn"), is a public affairs and communications

consulting firm based in Alexandria, Virginia.

90.     In late 2017 or 2018, Hawthorn approached government relations consultants

employed by Bernstein Shur and another Maine government relations consultant about doing work

to oppose NECEC on behalf of a client ("the Client"), which is identified as NEER.  (The Bernstein

Shur consultants together with the other Maine government relations consultant are referenced

---

[7]     *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 370 (D.C. Cir. 2024).

[8]     The following factual allegations are taken from the November 29, 2023 consent orders entered into between the Maine Commission and Stop the Corridor and Alpine Initiatives, found at (https://www.documentcloud.org/documents/24189988-stop-the-corridor-consent-agreement_0#document/p3/a2414135) and (https://www.documentcloud.org/documents/24212709-alpine-initiatives-consent-agreement#document/p2/a2421030), respectively.

collectively as the "Maine consultants.")  During 2018-2020, the Maine consultants worked as a team to organize opposition to NECEC and influence public opinion against the project.  Stop the Corridor was formed in April 2018 as a Maine limited liability company, Clean Energy for ME, to conduct these activities.

91.     In their early meetings, representatives of Hawthorn told the Maine consultants they should not publicly disclose the identity of NEER or Hawthorn and that all activities should be in accordance with Maine law.  The Maine consultants understood this to mean that, if Maine law required an activity to result in the disclosure of the name of Hawthorn or NEER, the Maine consultants should not engage in such activity.  Hawthorn retained the Maine consultants based on their expertise in Maine elections and election law and were relying on the Maine consultants to act within these parameters.

92.     The Maine consultants assert that they believed that none of their activities required Stop the Corridor to register as a ballot question committee or to identify its source of funding under Maine law.  The Commission staff's investigation did not find evidence that the consultants believed otherwise.

93.     During 2018-2020, Stop the Corridor worked within a coalition of organizations opposed to NECEC that included, among others, the Natural Resources Council of Maine ("NRCM"), the Sierra Club, and an association of volunteers that had been organized through a Facebook page.  Stop the Corridor engaged in a range of activities to oppose NECEC that did not implicate Maine's campaign finance laws and included, among other things, coordinating citizens to oppose NECEC in municipal proceedings, influencing public opinion through advertising, and coordinating with coalition partners on generating comments to state and federal agencies.  During 2019-2020, the Maine consultants communicated regularly with Hawthorn through scheduled

biweekly "Maine team update" telephone calls, other phone calls as needed, and email as needed. An employee in the Client's regulatory division sometimes participated in the 2019-2020 biweekly update calls in a listening role. Decisions about Stop the Corridor's operations were made through the Maine consultants and a representative of Hawthorn. Hawthorn received weekly reports on the progress of general activities to oppose NECEC in Maine. Hawthorn financially managed Stop the Corridor and provided 100% of its funding with fees collected from the Client. The following chart summarizes the flow of money that paid for Stop the Corridor's activities:



94. As described above, during the summer of 2019, the coalition of NECEC opponents decided to promote an initiated law that would direct the Maine Public Utilities Commission ("PUC") to reverse a certificate of public convenience and necessity that the PUC had issued for NECEC in May 2019. NEER reviewed the language of the initiative.

95. The time period for petitioning was October 18, 2019-February 3, 2020. Volunteers organized by coalition partners collected signatures on petitions.

96. The Maine consultants paid six field workers to train volunteers on the technicalities of collecting signatures on petitions. The firm also paid for other expenses to help with the coalitions petitioning effort such as travel, a website for volunteers to sign up to petition, printing, postage, and office supplies. The total value of these services ($85,726) was communicated to a PAC, No CMP Corridor, which reported them as in-kind contributions in three campaign finance reports filed with the Commission during October 2019-April 2020. This reporting indicated that Stop the Corridor had engaged in paid activities to assist with petitioning,

but it did not disclose any information about the sources that paid for Stop the Corridor's assistance.

97.    The Maine consultants are skilled campaign professionals with personal experience managing ballot question campaigns.  Among other consulting services, the Maine consultants provided information and recommendations to promote the successful collection of signatures and related services to qualify the 2020 initiative for the ballot.  Hawthorn, through Stop the Corridor, paid an undetermined amount to Bernstein Shur for strategic political advice concerning the 2020 initiative.  For purposes of the campaign finance report required by the Consent Agreement entered into between the Maine Commission on Governmental Ethics and Election Practices and Stop the Corridor on November 29, 2023, the parties agreed and stipulated that $10,000 was the total amount of fees paid to Bernstein Shur that were reportable as campaign expenditures.

98.    The anti-NECEC coalition submitted the signed petitions to the Secretary of State on February 3, 2020.  While the petitions were deemed valid, the Maine Supreme Judicial Court ultimately determined that the 2020 initiative would not appear on the ballot and, accordingly, the 2020 initiative was never presented to Maine voters.

99.    The Commission, after reviewing thousands of pages of documents and conducting witness interviews, ultimately determined that Stop the Corridor violated Maine campaign finance laws by failing to register as a ballot question committee and failing to file the requisite campaign finance reports.

100.    Similarly, the Commission found that another Maine limited liability company ("LLC"), Alpine Initiatives, was used by NEER to contribute to the Maine Democratic Party without disclosing where the funds were coming from.

101.     In advance of the scheme, Bernstein Shur employees provided a mix of legal and consulting services for this purpose during 2018-2020.  As with Stop the Corridor, in early meetings with the Berstein Shur consultants in late 2017 or 2018, Hawthorn told the Bernstein Shur consultants they should not disclose Hawthorn or NEER and that all activities should be conducted in accordance with Maine law.

102.     In October 2018, the Bernstein Shur consultants viewed Democratic officials as generally more likely to oppose the NECEC project.  In anticipation of future lobbying activities with Democratic officials regarding potential legislation, the Bernstein Shur consultants explored the feasibility of making a substantial contribution to the Maine Democratic Party in connection with the "get out the vote" activities related to the upcoming general election.  The Bernstein Shur consultants believed the contribution would help their relationships with Democratic officials.

103.     Around two weeks before the November 6, 2018 general election, one of the Bernstein Shur consultants called the former Deputy Director of the Maine Democratic Party to discuss a potential donation toward the party's get out the vote activities.  That consultant asked: if the consultant had a donor that could contribute $100,000 or $150,000, would the party be able to use the contribution before Election Day?  The former Deputy Director confirmed the party could use that money to expand the party's activities to contact voters to encourage them to return absentee ballots.  The Bernstein Shur consultant did not identify the donor.  No policy agenda was attached to the contribution.  The contribution was intended to support the Democratic Party's get out the vote activities.  In a second conversation, the Bernstein Shur consultant confirmed that the amount would be $150,000 and the donor would be a new entity named Alpine Initiatives.  The Commission staff's investigation did not find evidence that NEER knew the purpose of the funds or to whom they would be paid.

104.     On October 23-24, 2018, the Bernstein Shur consultants and Hawthorn agreed to form a new LLC to make a donation to the Maine Democratic Party.  It was determined that the funds would flow as follows:



105.     Within a three-day period of October 24-26, 2018, the Bernstein Shur consultants caused Alpine Initiatives to be formed, opened its bank account, and made other necessary arrangements.

106.     On Monday, October 29, 2018, Hawthorn made a wire transfer of $160,000 to Alpine Initiatives' bank account.  The next day, October 30, 2018, Alpine Initiatives wired $150,000 to the Maine Democratic Party.

107.     In a 24-Hour Report filed with the Commission on October 29, 2018 (eight days before the general election), the Maine Democratic Party reported receiving $150,000 from Alpine Initiatives.  The party also reported the contribution in its 42-Day Post-General Election Report filed on December 18, 2018.

108.     Alpine Initiatives was the only source reported to the public of the $150,000 contribution identified in the Maine Democratic Party campaign finance reports filed with the Commission.  The public did not learn of the ultimate source of the contribution because it was reported in the name of Alpine Initiatives.

109.     Alpine Initiatives did not register and file campaign finance reports with the Commission as a PAC.

110.     Alpine Initiatives did not participate in any commerce within its 14-month existence.  Making the $150,000 contribution was Alpine Initiatives' only activity, other than

administrative tasks to maintain the LLC (*e.g.*, making corporate filings and paying routine fees). Alpine Initiatives did not lobby or participate in any other political activities.  It dissolved on December 31, 2019.

111.    The Commission, after reviewing documents and conducting witness interviews, ultimately determined that Alpine Initiatives violated Maine campaign finance laws by failing to register as a PAC and failing to file the requisite campaign finance reports.

### 3.    Under-the-Table Political Influence Peddling in Florida

112.    Matrix describes itself as a political consulting firm offering services in research, polling, public relations, and campaign management.  According to its bare-bones public website, its motto is "A Comprehensive Approach to Problem Solving."[9]  Matrix is headquartered in Montgomery, Alabama, and was founded by Dr. Joseph Perkins.  Jeff Pitts joined Matrix in 1995 and became Matrix's CEO in 2000.

113.    Media reports have called Matrix "secretive" and "the closest thing Alabama politics has to a non-governmental secret agency."[10]  Matrix has counted numerous energy companies in the Southeast as clients, including Southern Company, Alabama Power, Mississippi Power, and FPL.

114.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[9]     MATRIX, https://www.matrixllc.com/ (last visited May 19, 2024).

[10]    Mario Alejandro Ariza & Miranda Green, *Leaked: US power companies secretly spending millions to protect profits and fight clean energy*, THE GUARDIAN (July 27, 2022), https://www.theguardian.com/environment/2022/jul/27/leaked-us-leaked-power-companies-spending-profits-stop-clean-energy.

████████████████████████████   Matrix's relationship with FPL was spearheaded by Pitts, Matrix's then-CEO.

115.    Many of the unethical and potentially illegal aspects of the Matrix-FPL relationship were described in detail by Matrix Employee 1 ("ME 1"),[11] a former vice president of Matrix.  ME 1 worked at Matrix from the early 2000s until their departure in 2023.

116.    According to ME 1, Pitts aggressively worked to expand Matrix's business and opened an office in Tallahassee, Florida, as part of that expansion.  Pitts brought with him three associates: Greg Gilbert ("Gilbert") (Perkins' godson), April Odom ("Odom"), a contractor who regularly worked with Pitts, and Abigail MacIver ("MacIver").  According to ME 1, "only a few Matrix people got to do stuff in Florida.  It was a black box.  Pitts kept it to himself.  That was the source of the problems."

117.    In December 2020, Pitts advised Perkins that he was leaving Matrix to start a new firm, Canopy Partners LLC ("Canopy").  After Pitts left Matrix, Matrix discovered that "a server was left in Birmingham," Alabama that someone had tried to destroy with a "hammer" in an apparent effort to prevent access to the server's contents, according to ME 1.  Despite the attempt to destroy the server, however, Matrix employees were able to gain access to the server which provided evidence and information of all the work Pitts was doing for FPL which was hidden from most Matrix employees and from Perkins, according to ME 1.  ME 1 said that on the server there "were connections to Google Drives, cloud-based stuff.  Personal laptops ran through it."

118.    ME 1 was one of the Matrix employees who was brought in to assist with the evaluation of the information recovered from the damaged server.  ME 1 said that Matrix

---

[11]    All allegations concerning ME 1 come from the Second Am. Class Action Compl. for Violation of the Fed. Sec. Laws, *Jastram v. NextEra Energy, Inc.*, No. 9:23-cv-80833-AMC (S.D. Fla. Dec. 1, 2023), ECF No. 68 (the "Securities Complaint").

discovered "another set of books" that was kept and maintained by Pitts' subordinate Gilbert for the FPL schemes. According to ME 1, Pitts' team in Tallahassee "did the spreadsheets" and "kept the separate books" for the scheme. "There was a lot of misbehavior by the Florida crew. The FPL executives are tied up in it. There was a lot of money going into LLCs and disappearing."

119.     ME 1 stated that the Matrix investigation uncovered a scheme concerning the political campaign in Miami-Dade County, the late filing of Form 990s, and money flows that were highly suspicious.

120.     After Pitts left Matrix, Perkins filed suit against Pitts in the Circuit Court of Jefferson County, Alabama, against Canopy, Pitts, Gilbert, MacIver, and Odom, each of whom left Matrix to join Canopy. ME 1 stated that as support for the lawsuit, he was part of the team that uncovered Pitts' conduct. The team discovered Pitts' (and others') involvement in the "ghost candidate" scheme. ME 1 stated that the scheme, as reported by the press, was masterminded by Pitts and ME 1 was "sure Eric Silagy was aware of the scheme."

121.     ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████

122.     ███████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

123.   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

124.   ████████████████████████████████████

██████████████

125.   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

a.     **FPL's Failed Effort to Buy the Jacksonville Electric Authority**

126.    In 2019, the Company bid $11 billion to acquire the JEA.  FPL and its officers worked with Matrix to exploit the political process in an attempt to tilt the tables towards FPL, including a potential plan to bribe a sitting Jacksonville councilperson.  The JEA purchase process eventually fell apart amid scandal, which is the subject of two ongoing federal criminal prosecutions.

127.    JEA, an independent agency of the City of Jacksonville, is a non-profit utility company serving the Jacksonville area with a substantial customer base that includes close to 500,000 individuals relying on electric, water, and sewer services.  As one of the largest publicly owned utilities in the nation, JEA operates under the governance of a seven-member board appointed by the Mayor of Jacksonville and confirmed by the City Council.

128.    FPL's service area surrounds and touches the area served by JEA, creating a gap or "hole" in FPL's coverage.  In late 2017, JEA began considering the idea of privatizing their utility services.

129.    On July 23, 2019, after over a year of internal discussions, the JEA Board of Directors authorized JEA's senior leadership to initiate the process of selling JEA.  This involved issuing an Invitation to Negotiate ("ITN") as required by Florida law for procurement.  The ITN called for written proposals from vendors or bidders to compete for the opportunity to negotiate.  Before the privatization of JEA could be finalized, the selected bidder would need approval from

the JEA Board, the Jacksonville City Council, and the support of Jacksonville voters through a successful referendum vote.

130.    At the same meeting on July 23, 2019, the JEA Board also authorized senior leadership to establish a long-term incentive plan and Performance Unit Plan ("PUP") that would compensate participants in part based on the amount of capital collected by the City of Jacksonville from the sale of JEA.

131.    Because of its large customer base and service region, JEA was an appealing acquisition target for NextEra and FPL.  The Company moved fast to position itself for success in obtaining Jacksonville City Council approval and a prospective referendum.

132.    FPL and Silagy relied on Matrix and its network of associates to engage in alleged improper tactics during FPL's efforts to purchase JEA.  These tactics included (1) making a bogus job offer to a City Councilor who was opposed to privatization in order to get him out of the way, and (2) secretly monitoring a journalist who was critical of FPL's bid and the privatization of JEA.

133.    In the end, the JEA privatization plan fell apart as a result of a related internal scandal.  The Jacksonville Council Auditor uncovered that JEA's CEO Aaron Zahn ("Zahn") and Chief Financial Officer Ryan Wannamacher ("Wannamacher") would receive millions of dollars in bonuses if JEA went through with the privatization under the terms of the PUP.  The JEA Board revoked the PUP and paused the JEA auction process after this information became widely known. The U.S. Department of Justice indicted Zahn and Wannamacher for conspiracy and wire fraud on March 2, 2022.

134.    Notably, FPL went to great lengths to conceal Matrix's role in the Company's efforts to buy JEA.  For example, in response to a subpoena issued on April 7, 2020, by a special Jacksonville City Council committee tasked with examining the failure of the JEA privatization

process, NextEra did not include Matrix in the list of firms it engaged to work on its proposal or lobby on its behalf.

135.    When confronted with evidence of Matrix's conduct during the attempted purchase of JEA, FPL and NextEra admitted that Matrix had been hired to "assist our company with due diligence, public outreach, and communications efforts during the sale process," but they also issued a series of false denials to distance the Company from the alleged conduct.

136.    Furthermore, as detailed below, when asked directly by reporters whether he had been subpoenaed by federal prosecutors in connection with the criminal case against Zahn and Wannamacher, Silagy falsely claimed in May 2022 that "we've never been subpoenaed," in connection with the prosecution of JEA's former executives when, in fact, federal prosecutors issued a subpoena to NextEra regarding the JEA scandal on April 21, 2020.

**i.    Matrix Extended a Phony Job Offer at "Grow United" to a Jacksonville City Councilor to Try to Get Him Out of the Way**

137.    In late 2017, Rev. De-Ves Toon ("Toon"), a National Field Director for the National Action Network who had recently arrived in Jacksonville, began to organize a new group called "Fix JEA Now."

138.    Fix JEA Now was substantially, but surreptitiously, funded by FPL, via a network of intermediary groups formed and managed by Matrix personnel.  Ledgers for multiple businesses managed by former Matrix employees, shared with NextEra as part of the Matrix Memo, show that more than $180,000 in total payments went to Toon in 2018.  Some of these payments are specifically related to the JEA initiative.  The majority of them refer to FPL as the client who was invoiced for the various payments.

139.    FPL has now admitted that it was "aware that Matrix was paying Rev. Toon to support a number of polling and outreach efforts for multiple clients" and that it "had knowledge of the Fix JEA Now organization."  ME 1 confirmed that they worked under Pitts' instruction and on behalf of FPL to establish a website for "Fix JEA Now" in order to "get people fired up to divest from JEA."

140.    In 2019, during the JEA privatization process, Toon served as the intermediary for a dubious employment offer made to Jacksonville City Councilor Garrett Dennis ("Dennis"), a fierce opponent of JEA privatization.

141.    According to the *Florida Times-Union*, Toon urged Dwight Brisbane, a consultant with ties to Councilor Dennis, to contact Dennis and communicate an offer to work for "Grow United," purportedly a group that advocated for marijuana decriminalization.  The job offer featured a $180,000 yearly salary and compensated travel expenses, but it was contingent on Dennis leaving the City Council.

142.    Dennis later informed reporters that the offer seemed suspicious.  Dennis discounted the offer as a scam after seeing that Grow United had no major online presence.

143.    ███████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████

144.    ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

145. 

146.

147.

148.

149. 

> **ii. FPL's VP of State Legislative Affairs, Daniel Martell, Was Contemporaneously Aware of Matrix's Covert Surveillance of a Journalist**

150.    Throughout the purported sale process, *Florida Times-Union* reporter, Nate Monroe ("Monroe"), wrote a series of columns criticizing JEA for its attempted sale to a private buyer. These columns criticized both the sales process and its potential impact on the people of Jacksonville. In one column, for example, he wrote, "[e]ven in this town, the total secrecy of the negotiation process is a hard sell[. . . .] Everyone is simply supposed to rejoice and ask no questions when [JEA CEO Aaron] Zahn emerges from the shadows with a fully negotiated deal." His criticism of a potential deal was especially sharp when he covered FPL's bid:

> So let's say Zahn gets his way and JEA is sold to our fake power company, Florida Flower and Bright. And let's say Florida Flower and Bright owns all the service territory around Jacksonville, as well as the territory including millions of more customers elsewhere in the state. Who actually thinks our made-up utility won't be cutting significant staff after it acquires JEA? Will Florida Flower and Bright promise that by 2030 it will still employ 2,000 people? Or will Florida Flower and Bright — with a robust network of its own power plants, transmission lines, offices and customer-service centers — shuffle around a few regional resources and decide it can save money by cutting its newly acquired utility?

151.    Monroe's coverage threatened to weaken public support for FPL's acquisition of JEA. ████████████████████████████████████████████████████████████████



152.

153.

154.    ME 1 indicated that Martell traveled to Matrix's offices on multiple occasions for in-person meetings.  According to ME 1, Martell "reported directly to Silagy" and there were no intermediaries between the two FPL executives.

155.     Monroe's coverage of FPL extended into 2020, and Matrix continued to stalk him.  For example, on October 1, 2020, he published a post headlined "Dear FP&L: It's Not Really Charity if You Get Something Out of It."  The piece chastised FPL for one component of its 2019 campaign to buy JEA: attempting to sway the votes of Jacksonville city councilors with gifts to nonprofits they lead.  This article triggered a new round of surveillance.  According to the *Florida Times-Union*, Matrix received a photograph of Monroe, his girlfriend, and his dog outside their apartment timestamped 5:48 PM on October 14, 2020 – two weeks after the column.

156.     ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████

157.     When confronted with proof of Monroe's monitoring, FPL and Silagy made false and deceptive statements and denied having requested the report or approved his surveillance.

158.     FPL went to great lengths to conceal Matrix's role in the Company's efforts to buy JEA.  For example, in response to a subpoena issued on April 7, 2020, by a special Jacksonville City Council committee tasked with examining the failure of the JEA privatization process, NextEra did not include Matrix in the list of firms it engaged to work on its proposal or lobby on its behalf.

159.     When confronted with evidence of Matrix's conduct during the attempted purchase of JEA, FPL and NextEra ultimately admitted that Matrix had been hired to "assist our company with due diligence, public outreach, and communications efforts during the sale process," but they also issued a series of false denials to distance the Company from the alleged conduct.

160.     Furthermore, when asked directly by reporters whether he had been subpoenaed by federal prosecutors in connection with the criminal case against Zahn and Wannamacher, Silagy falsely claimed in May 2022 that "we've never been subpoenaed," in connection with the prosecution of JEA's former executives when, in fact, federal prosecutors issued a subpoena to NextEra regarding the JEA scandal on April 21, 2020.

### b.     FPL and Matrix Orchestrate the "Ghost Candidate" Scheme

161.     Matrix personnel kept detailed ledgers of FPL's political spending, which Pitts' team helped surreptitiously direct to at least five spoiler or "ghost" candidates – two in the 2018 election cycle and three in the 2020 election cycle – used to siphon votes away from candidates FPL opposed.

162.     The majority of Matrix and FPL's target races involved candidates for the Florida State Senate.  Florida Senate seats were especially significant to FPL since the Florida Senate is in charge of approving members to the FPSC, which supervises FPL and other utility corporations.

163.     With Silagy's direct involvement in planning, and FPL personnel involved in execution, Pitts and his Matrix subordinates established at least 19 different 501(c)(4) non-profit entities to form a "daisy chain" through which FPL money could be effectively laundered to support or oppose political candidates, while concealing FPL's involvement from the public.

### i.     Spoiler Candidates in the 2018 Election Cycle State Senate District 8

164.     In the run-up to the 2018 election for Florida State Senate District 8, an incumbent senator supported by FPL faced a stiff fight from challenger Kayser Enneking ("Enneking").

165.     FPL and Matrix initially tried and failed to defeat Enneking during her primary election.  With Silagy's direct involvement, Matrix and FPL established a 501(c)(4) entity,

Mothers for Moderation, to secretly inject FPL money into the 2018 elections and beyond, starting with Enneking's primary in early 2018.  Mothers for Moderation reportedly spent $100,000 on mailers and television advertising supporting a political committee called Liberation Ocala that backed Enneking's primary opponent.  Mothers for Moderation provided all of Liberation Ocala's funds that year.

166.    Mothers for Moderation itself was almost entirely funded by FPL.  According to an internal Matrix ledger obtained by the *Orlando Sentinel*, FPL donated almost $14 million to Mothers for Moderation between August and December 2018 alone, accounting for virtually all of the organization's revenue that year.  ██████████████████████████████████████

██████

167.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

168.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

█   ██████████████████████████████████████

██████████████████████████████████

█   ██████████████████████████████████████

██████████████████████████████████████



169. ███████████████████████████████

170. ███████████████████████████████

171. ███████████████████████████████

172. ███████████████████████████████



173. ██████████████████████████████████

174. ██████████████████████████████████

175. ██████████████████████████████████

176. ██████████████████████████████████

177. ██████████████████████████████████

178. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

179. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

180. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

181.   ████████████████████████████████████████████, Broken

Promises made a direct $20,000 donation to Charles Goston's ("Goston") political committee.

Goston was a no-party straw candidate who shared Enneking's political views and entered the race

with the intention of fragmenting Enneking's support base.  The sole person that contributed to

this committee was Broken Promises.

182.   Two weeks later, Broken Promises spent $52,000 in mailings to promote Goston.

Following the receipt of the second $100,000 installment from FPL, Broken Promises continued

to support Goston with approximately $63,000 in advertising.  The combined value of the two "in-

kind" advertising gifts was approximately $115,000.  These costs made up 71.7% of all the money

Broken Promises spent in 2018.

183.   Political participation is allowed for organizations such as Broken Promises, which

are governed by 26 U.S.C. §501(c)(4) in addition to their general advocacy of "social welfare"

activities.  Nonetheless, the IRS does not view political activity as advancing societal welfare.  A

501(c)(4) organization's principal goal cannot be to carry out political activities in order to

preserve its tax-exempt status and, consequently, hide their funders.  Assessing whether political

spending makes up more than half of an organization's expenses is one general guideline the IRS

employs to decide whether political activity is a 501(c)(4) organization's main focus.

184.   Only $45,000 in expenses were listed by Broken Promises as "Lobbying" in its

federal tax filings on Form 990.  This amount would cover the $20,000 that the organization gave

to Goston's political committee and the $25,000 that Broken Promises gave to Consumers for

Energy Fairness, another PAC.

185.    The tax filings of Broken Promises also listed $115,510 (roughly equivalent to the entire amount spent on Goston-supporting in-kind advertisements) in "other" spending; however, none of these amounts, which added up to 99.6% of the organization's total expenditures in 2018, were disclosed as political spending.  Rather, in response to the inquiry, "[d]id the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office?[,]" Broken Promises said "No," and accordingly did not submit the necessary Form C disclosure along with its Form 990 disclosing political contributions.  After studying Broken Promises' tax returns, a Loyola Marymount University tax law professor who was interviewed by the *Tampa Bay Times* in August 2022 verified that this depiction did, in fact, "not seem accurate at all," considering that Broken Promises' 2018 spending would be considered "political activity."

186.    Companies such as FPL are also permitted to contribute to politics.  However, it is illegal under federal and Florida law to conceal political contributions via "straw" donors like Broken Promises.  Giving money under another person's name is forbidden by the Federal Election Campaign Act ("FECA") and Florida law bars giving money "through or in the name of another, directly or indirectly, in any election."  FLA. STAT. §106.08(5)(a).

187.    When the media began to question FPL's involvement in the 2018 District 8 contest in August 2022, FPL did not refute having contributed to Broken Promises.

188.    In an interview with the *Tampa Bay Times* for a story published on August 8, 2022, a tax law expert from the University of Pittsburgh Law School said that FPL's use of Broken Promises to hide contributions in favor of Goston "tells you they have concerns about disclosing their support of this candidate to voters and they had some intention to hide it."

189.    Enneking was defeated by less than two thousand votes.  Enneking asserted that during "policy debates" with Goston, "there was not one iota of difference between what he was advocating for and what I was advocating for," except to the extent the similarities would help to effectively siphon votes from Floridians who could not distinguish between the two.

190.    At $145,000, Goston's campaign budget was significantly less than that of his opponents in the District 8 race.  Enneking told the *Tampa Bay Times* in August 2022 that sponsoring a spoiler candidate was a "cheap way to siphon votes off."

191.    On December 17, 2020, a nonpartisan, nonprofit watchdog group called Citizens for Responsibility and Ethics in Washington (or "CREW") filed a complaint with the IRS, requesting an investigation into whether Broken Promises "violated federal law by failing to properly disclose its political contributions" in 2018.  According to the complaint, Broken Promises engaged in political activism as its principal activity in 2018 and neglected to disclose its political spending on Form 990 in violation of 26 U.S.C. §§501(c)(4) and 6652.  Two weeks later, Broken Promises filed for dissolution.

### ii.    Commission District 8 of Miami-Dade County

192.    FPL opposed an incumbent candidate in the 2018 Miami-Dade County Commission District 8 race, Daniella Levine Cava ("Levine Cava").  Levine Cava had previously fought FPL plans related to its Turkey Point nuclear power plant.

193.    In early 2018, a website smearing Levine Cava as an elitist, KeepingUpWithCava.com, went live.  Unbeknownst to the public, Matrix, funded by FPL, set up the website. █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

50

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

194.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

195.    Unfortunately for FPL, Levine Cava's base of support remained strong, and she seemed likely to win outright in the upcoming August 2018 election.  Pitts and his associates at Matrix, therefore, hatched a plan to split Levine Cava's base in two by introducing a politically similar challenger.  Matrix did not have any hope or desire for the challenger to win, but believed he could eat into Levine Cava's support enough to force her into a run-off with her opponent, Gus Barreiro ("Barreiro").

196.    According to a story published on August 25, 2022, by the *Miami Herald*, Matrix focused its efforts on Johnathan Burke ("Burke"), a 33-year-old man with several arrests on his record who had never run for office before.  Pitts had met Burke on June 11, 2017.  The next day, Pitts texted Burke: "look forward to working together."

197.   A little over a week after meeting Pitts, on June 20, 2017, Burke spoke at a city commission meeting in South Miami in opposition to a proposed ordinance which would require contractors to install solar panels on newly constructed residences.  FPL at the time was strongly against the ordinance.

198.   To support Burke's 2018 candidacy, Matrix secretly sent $12,000 in FPL funds to a political strategy firm called PDG Strategies brought in to advise Burke's campaign.  An executive at PDG Strategies confirmed that Matrix paid PDG Strategies to work on Burke's campaign, as reported in the August 25, 2022, *Miami Herald* story.

199.   These funds were not, however, the only support FPL provided for the candidate. Using $120,000 in FPL funds, routed through an Alabama-based company called Tarella, Inc. ("Tarella"), Pitts (i) paid Burke a $60,000 salary in 2017 and (ii) paid $2,300 per month starting in 2017 to cover the rent for Burke's home in Miami-Dade District 8, according to internal Matrix financial records, emails, and text messages the *Miami Herald* obtained and reported on in the August 25, 2022, story.  The *Miami Herald* reported in the same story that "[s]everal of the payments to Tarella [we]re marked 'Miami Dade Election' or 'County Commission,'" and "[a]ll the transactions were listed as being made with FPL funds."

200.   Because Burke needed to live in Miami-Dade Commission's District 8 for six months to be able to run against Levine Cava, Pitts made arrangements to move him to a home in Cutler Bay on FPL's dime.  Tarella – a firm founded by a former Matrix lobbyist, Paul Hamrick ("Hamrick"), who was working closely with Pitts and sometimes out of Matrix's office – wrote a letter to Burke's landlord on August 23, 2017, memorializing an oral agreement for Tarella to pay Burke's $2,300 rent, according to documents obtained by the *Miami Herald*.  The letter suggested

that it was important to Burke to stay in the area because of the "school district," and added "it certainly is important to this company for his residence to be resolved."

201.    On February 6, 2018, Hamrick texted Pitts, alerting him that Burke's rent was due, but Tarella had insufficient funds to pay it.  Pitts asked for Hamrick to forward along the invoice so he could "take care of it."  A Matrix ledger showed that, the next day, Matrix sent $2,500 to Tarella with a note that the money had come from FPL funds.

202.    On March 13, 2018, according to the Matrix documents obtained by the *Miami Herald*, Hamrick sent an email message to Pitts with the subject line "Miami."  Hamrick told Pitts they needed to get Burke to announce his candidacy for the upcoming election, and that he thought Burke would be "effective if we just have a plan we make him follow."

203.    On August 28, 2018, Levine Cava was reelected with 62% of the vote.  Matrix's plan failed, but this was primarily due to Barreiro's poor showing (he received just 21% of the vote).  The spoiler candidate, Burke, had successfully attracted 17% of votes.

204.    Another individual, Dan Newman ("Newman"), also worked to advise Burke.  Newman was a Matrix subcontractor who had previously worked as a lobbyist at a firm representing FPL and as a fundraiser for the Florida Democrats' Legislative Campaign Committee.  Newman sent a text message to Pitts and MacIver sharing the election results on August 28, 2018.  MacIver responded: "Well that's a respectable vote number for JB.  If [B]arriero had done a decent job our plan might have paid off."

205.    After the election, Pitts suddenly ceased almost all contact with Burke.  On October 26, 2018, Burke texted Pitts stating that he had "not heard much since Election Day" and asking if he should "expect to see or hear from anyone again or is this the end of the road?"  Pitts did not respond.  Then, on Wednesday, February 27, 2019, Burke texted Pitts acknowledging that "Friday

March 1st marks the conclusion of our agreement and will be the last time I have to bug you about funds, unless further work is agreed upon." Again, Pitts did not respond.

206.    Levine Cava ran for Mayor of Miami-Dade County in 2020, winning the election on November 3, 2020. While a candidate in the lead-up to the mayoral election, a news website called the *Capitolist* ran a piece attacking Levine Cava on June 4, 2020. As described more fully below, the *Capitolist* at the time was being funded by FPL, through a Matrix shell entity which had executive and editorial control over the news website. Silagy and Martell in particular were frequently consulted for approval or edits to stories and requested pieces on particular subjects.

207.    According to the August 25, 2022, report in the *Miami Herald*, the day the June 4, 2020, *Capitolist* piece attacking Levine Cava was posted, FPL Vice President of External Affairs and Economic Development Pam Rauch texted Pitts: "She deserves this!" in response to the story. Silagy responded to the story via a text to Pitts the next day: "Love it!"

### iii.    Ghost Candidates in the 2020 Election Cycle

208.    In mid-2020, several of FPL's favored candidates for Florida State Senate seats were locked in tight races with candidates the Company disfavored and actively wished to unseat. Taking the lessons they had learnt from the 2018 election cycle into 2020, Matrix and FPL used similar, if not more sophisticated, covert strategies to steal votes from FPL's political rivals.

209.    The scheme centered on running and promoting at least three "ghost" candidates – persons who had no interest in campaigning or actually holding elected offices but who were paid or otherwise induced to enter the race merely to divert votes away from legitimate candidates. In a close election, the ghost candidates would be pushed using fictitious names, platforms, or other characteristics that resembled the unpopular candidates to divert enough votes to swing the result.

210.   The three ghost candidates were Jestine Iannotti ("Iannotti") in Senate District 9, Alex Rodriguez in Senate District 37, and Celso Alfonso in Senate District 39.

211.   Frank Artiles ("Artiles"), a former senator of District 40, was actively involved in the scheme.  Prosecutors from the Miami-Dade State Attorney's Office claim that Artiles made former Major League Baseball player Alex Rodriguez an offer of $50,000 to run in the District 37 election.

212.   At the time, Artiles was employed as a contractor by the nonprofit organization "Let's Preserve the American Dream" (LPAD), where he reported to Alex Alvarado ("Alvarado"), a political operator.

213.   According to documents made public by the Miami-Dade State Attorney's Office, Artiles has received $125,000 from LPAD for "South Florida research services" since 2017.  The last payment to Artiles was November 15, 2020, three days after District 37 incumbent Senator Jose Javier Rodriguez ("Senator Rodriguez") lost in a manual recount.

214.   LPAD, in turn, was associated with a lobbying entity called "Associated Industries of Florida," or "AIF."  LPAD operated out of AIF's building, and AIF's former Vice President, Ryan Tyson ("Tyson"), was listed as LPAD's executive director in 2020 according to LPAD's 2020 Form 990, filed on November 17, 2021.  The *Orlando Sentinel* reported on July 30, 2021, that "Alvarado sometimes forwarded Artiles' invoices to an executive at AIF," and reported on November 18, 2021, that FPL was an AIF member and one of AIF's biggest donors.

215.   LPAD did not disclose its donors in 2020.  A prior entity with the same name as LPAD, however, was run by the same person and out of the same address from 2014 to 2016.  That entity, which was organized at the state level in Florida and was required to disclose its donors, was funded by FPL, according to a November 18, 2021, *Orlando Sentinel* story.

216.    The ghost candidates were promoted by two political committees: "The Truth," which sent mailers supporting Iannotti in Senate District 9, and "Our Florida," which sent similar materials in support of Alex Rodriguez and Celso Alfonso to voters in Districts 37 and 39, respectively.  Both committees were run by LPAD's Alex Alvarado, and like LPAD, were run out of AIF's headquarters.

217.    Unlike the 2018 spoiler candidates backed by FPL, who at least pretended to promote themselves through cheap, bare-bones campaigns, the 2020 ghost candidates did almost no campaigning on their own behalf.  Instead, The Truth and Our Florida spent $550,000 promoting the ghost candidates.  For example, as the *Orlando Sentinel* revealed over a year later, residents of Seminole and Volusia counties received mailers promoting Iannotti in the weeks leading up to the 2020 elections.  The woman depicted on the mailers was Black, and the mailers stated that she supported social justice and campaign finance reform.  In fact, Iannotti was Caucasian and was planning to relocate to Sweden at the time.

218.    The official chairperson of the committee behind Iannotti's promotional material, "The Truth," was also merely a figurehead.  Because political committee chairs must be disclosed, the LPAD political operative behind "The Truth," Alvarado, paid a 25-year-old college student named Hailey DeFilippis $1,500 to sign the committee's registration forms.  Alvarado paid another woman, Sierra Olive, 23, $2,000 to sign the paperwork making her the official chairperson of "Our Florida."

219.    "The Truth" and "Our Florida" were entirely funded by Grow United, the same 501(c)(4) organization that FPL and Matrix used the year before to offer Jacksonville City Councilor Garrett Dennis a job in exchange for resigning from the council.  Grow United contributed $550,000 to The Truth and Our Florida in order to fund the ghost candidate scheme.

Odom, who was working for Matrix at the time, and LPAD's Alvarado coordinated the payments. Richard Alexander, Odom's brother, was officially listed as Grow United's chairman, but like the others, Alexander was a figurehead, designed to conceal Odom's and Matrix's involvement.

220.    According to the Securities Complaint, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

221.    According to LPAD's 2020 Form 990, Grow United received $1.15 million in "general support" funding from LPAD in 2020.  At least $600,000 of that total was set aside for the political committees that promoted the phantom candidates.

c.      **Matrix and FPL Established and Funded the Ghost Candidates' Funding Structure**

222.    Although FPL and Matrix went to great lengths to conceal their involvement from the public, the funding that flowed through Grow United to prop up the ghost candidates was carefully planned by Pitts, Silagy, and their associates.  The *Orlando Sentinel* reported on December 2, 2021, confirming that Matrix consultants who controlled Grow United, "the dark-money nonprofit at the center of the 'ghost' candidate scandal, billed FPL for more than $3 million days before they began moving money through the entity."  Matrix, in particular, sent invoices to

FPL via several entities, including TMP Interactive, People Over Profits, and ENH Industries, and directed the funds to Grow United, which in turn funded the two committees that paid for the mailers promoting the ghost candidates' campaigns. The article went on to say, "FPL has donated more than $10 million in recent years to other dark-money non-profits controlled by some of the same consultants [Matrix] - and FPL CEO and President Eric Silagy has personally coordinated with those consultants on campaign contributions made through their nonprofits."

223.    In the run-up to the 2020 election, FPL was particularly concerned that incumbent Senator Jose Javier Rodriguez would keep his seat in District 37. During his tenure, Senator Rodriguez opposed FPL's plans to expand a nuclear plant in South Florida and frequently irritated FPL executives with his policy positions in favor of deregulating private energy production and sale. According to a July 22, 2022, *Orlando Sentinel* report, FPL admitted that it "wanted the veteran senator out of office."

224.    According to the report, on January 7, 2019, Reuter sent an email with the subject "Florida Lawmaker Again Files Bill That Would Help Break Monopoly-Solar Stranglehold" to Defendants Robo, Silagy, and other NextEra personnel. The message included a story from the *Miami New Times* about a bill introduced by Senator Rodriguez that would allow "property owners to sell home-generated solar power to others, including tenants," without being regulated like a traditional "public utility." According to the story, Florida's energy utilities, including FPL, were concerned about the possibility of individual property owners competing in the energy market. The story quotes Senator Rodriguez as saying, "[s]imply put, the big utilities use their political muscle to maintain outdated monopolies."

225.    Later that morning, on January 7, 2019, Defendant Silagy forwarded Reuter's email about Senator Rodriguez's bill to Martell and FPL Vice President of Government Affairs John

Holley.  Silagy's message, in its entirety, read: "JJR at it again. I want you to make his life a living hell [. . .] seriously."

226.    Martell forwarded Silagy's message to Jeff Pitts the same day.

227.    Matrix asked Dan Newman, a Matrix subcontractor who had previously worked as an FPL lobbyist, to devise a strategy to remove Senator Rodriguez.  Records from a criminal investigation into the ghost candidate scheme, released on January 18, 2022, revealed that Tyson told prosecutors Newman was working as a contractor for LPAD.

228.    According to the *Miami Herald*, Newman wrote a memo to Pitts on June 5, 2019, suggesting that a competing primary candidate could defeat Senator Rodriguez.  The memo warned that if Senator Rodriguez kept his seat after the 2020 election, he would "have increased significance" due to his seniority in comparison to other officials.  Although Newman's memo focused on a primary challenge, and no primary challenge was mounted against Senator Rodriguez, it suggested a strategy similar to that used by the ghost candidate scheme in the general election: support a legitimate opponent to Senator Rodriguez while simultaneously bringing in a third candidate to "Capture His Base" by "run[ning] a campaign to reduce JJR's support among" his own core voters.  However, Newman cautioned that more research was needed to determine whether the spoiler candidate would steal more votes from Senator Rodriguez or his opponent.

229.    According to Newman's memo, challenging Senator Rodriguez could cost $3.35 million to $3.8 million, including $500,000 to support the third, spoiler candidate.  Because "[i]n all likelihood, they will not have their own fund," Newman's budget included $450,000 for the promotion of the third candidate and $50,000 to build a "credible team."  The memo requested that $3 million of the total budget come "from the client."  These sums are notable for being nearly identical to what FPL contributed to Grow United just before it funded the ghost candidate

committees ($3 million), and just shy of what Grow United ultimately contributed to the ghost candidate committees ($550,000).

230.    According to the Securities Complaint, on June 20, 2019, Martell sent Pitts an email with the subject "things to go over."  Martell's list contained two of the four items: "SD 39" and "SD 37."

231.    A month later, at 1:30 PM on July 19, 2019, Pitts met with Silagy, Julie Holmes (an NEE vice president), and others to discuss "Dereg Budget," according to an internal Matrix calendar.  The meeting was scheduled on Pitts' calendar to take place in "Eric's office."

232.    On October 3, 2019, Tyson sent an email message from his LPAD email address to Martell's FPL email address, with the subject line "Items you requested."  The email attached Newman's June 2019 memo.  The email began with the salutation "Danny –" and Tyson wrote that the attached memo was "our original proposal into SD 37[. . . .]"  The attachment was titled "SD37 JJR PROPOSAL.pdf."

233.    Then, on October 9, 2019, Martell sent Pitts a text message reading: "We need to catch up this pm.  Eric has an ask."  The two arranged to have a phone call at 5:00 PM that evening.

234.    Shortly thereafter, Pitts retained an attorney to help create legal entities for use as funding vehicles for FPL's activities related to the 2020 election.  ███████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████

235.    According to the Securities Action, on October 21, 2019, Pitts met with at least Martell and Tyson.  According to text messages between Pitts and Martell, Pitts picked up Martell and Tyson from the airport.  "Onboard plane.  See you soon.  Tyson coming with us from airport," Martell said in a message to Pitts, to which Pitts affirmed that he would be waiting "outside baggage claim."

236.    ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

237.    ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

238.    ███████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████

239.   

240.    According to the Securities Complaint, on November 22, 2019, the Foley & Lardner attorney sent Pitts another email message with a revised plan to form SUN Marketing as a C Corporation rather than a S Corporation attached.  The email stated that "Pam sent an email earlier today [. . .] suggesting that the project was on hold[. . . .]  I think that the whatever decision was made was from an internal FPL perspective[. . . .]"  The email suggested, "[i]f FPL is getting concerned about having an officer in the ownership role," Foley & Lardner could serve as directors for a fee.

241.    The email also stated, "[y]esterday you asked me a series of questions about how a C Corp would be handled."  Below, the attorney provided answers to a number of these questions, including, "[i]s the owner's name still free from public inspection?" Yes," and "Does this affect the possibility that FPL would have to report the revenue of SUN on their balance sheet? Unfortunately, as long as an officer of FPL is the owner, the reporting requirements may still apply."

242.    According to the Securities Complaint, a slide deck attached to the November 22, 2019, email described 501(c)(4) organizations, with one benefit listed as: "Contributions to the

general operating fund of a (c)(4) are generally not publicly disclosed." (Emphasis removed.) Another slide on 501(c)(4) organizations stated, "Political activity can include activity supporting or opposing candidates as long as these activities are not the entity's primary purpose." (Emphasis removed.) Another slide went on to say: "Federal and Florida law does not require donor disclosure if contributions are made for general purposes without being earmarked for a particular purpose."

243. 

244.

245.

246.

247.



248.

249. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

250. ██████████████████████████████████████

█████████████████████████

251.     SUN Marketing & Advertising ("SUN Marketing") was incorporated in Delaware on December 13, 2019, approximately two weeks after Silagy received the Funding Memo and Legal Memo.   On December 17, 2021, Reuter admitted to the *Orlando Sentinel* that FPL contributed $250,000 to SUN Marketing in December 2019 – at most two weeks after its official formation.  Reuter also stated that FPL believed Matrix controlled SUN Marketing.

252. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

253.    ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

254.    ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███

255. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

256.     On September 17, 2020, Pitts sent Holmes another $1 million invoice, ostensibly for consulting and research.  On this invoice, which was also attached to the Matrix Memo, the PO number was left blank.  Overall, as detailed in the memorandum, Pitts directed $1,994,500 of the FPL funds received in September 2020 into People Over Profits, a nonprofit organization connected to Newman that was a major source of funds for Grow United, which seeded the two committees used to promote the ghost candidates, as described above.



257. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

258. ████████████████████████████████████

██████████████████████████████

259. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



263.    According to the Securities Complaint, documents obtained through a public

records request to the Florida State Attorney's Office, Miami-Dade and Seminole Counties, filed

by the Florida Center for Government Accountability confirm the amounts stated above were transferred from Grow United to the Truth and Our Florida.

264.    The documents showed a $100,000 wire transfer and $80,000 check from Grow United to The Truth on October 2, 2020, exactly as described in the messages, and a record from the Florida Department of State Division of Elections showing a $370,000 contribution from Grow United on October 3, 2020.

265.    According to the Securities Complaint, on October 16, 2020, MacIver forwarded to Tyson a *POLITICO* news story titled "Mystery donor spends $180K on Florida political mail." The story concerned The Truth's $180,000 in mailers and questioned who was funding it.  The story reported "[a]s recently as May, the phone number listed as by [sic.] the committee in campaign finance records also appeared in online advertising for female escorts."  MacIver wrote: "These dark money groups are be[coming] pervasive[.]"   "[F]or the record," Tyson wrote in a responsive email that same day, "there was no way to know this was an escorts number.  That's a random thing they assign AA on the app."   "I think it's hilarious and just makes them more confused," MacIver responded to Tyson and Pitts.

266.    According to the Securities Complaint, on October 27, 2020, less than a week before the November 3 election, a consultant for Public Concepts, LLC ("Public Concepts"), sent MacIver an email with the subject line "Danny Request."  The consultant, Richard Johnston, and Public Concepts had previously worked with Matrix on an attack campaign against South Miami Mayor Phil Stoddard in 2018, which FPL later admitted it played a role in.  Public Concepts also helped FPL gain control of the *Capitolist*, as described below.

267.    Johnston's message read: "Danny asked for a report he can show to WS on Friday," including a "[m]ap of the doors canvased in SD 37 and SD 39."  On information and belief, the

"Danny" referenced in the message is Daniel Martell, who commonly went by "Danny."  ME 1, who attended approximately a dozen meetings with Martell at Matrix's offices, referred to Martell as "Danny"; Tyson's email to Martell on October 3, 2019, used the salutation "Danny –"; the Matrix Memo references a bank account Pitts referred to as the "Danny special"; and Newman, by contrast, went by "Dan."  Further, Martell had previously listed "SD 37" and "SD 39" as things to "go over" with Pitts in June 2019, not long before a meeting Pitts had with Silagy in the latter's office.  Additionally, as the Securities Complaint explains, "WS" was likely meant to refer to Eric Silagy.  "W" and "E" are adjacent on a keyboard, making a typo likely, and both Martel and Matrix personnel routinely used "ES" to refer to Silagy in text messages and emails (*e.g.*, in a message stating "ES" wanted the *Capitolist* to run a story on December 21, 2019; Pitts referred to Silagy as "ES" in a May 7, 2020 email; MacIver referred to Silagy as "es" in an August 27, 2020 email).  As alleged in the Securities Complaint, no other relevant Matrix, Public Concepts, or senior FPL officer had the initials "WS," or "ES."  Accordingly, Plaintiff adopts the reasoning in the Securities Complaint that the email supports the inference that Silagy received reports on canvasing in at least two of the ghost candidate races just a week before the election.  MacIver forwarded the message to Pitts on October 29, 2020.

268.    On November 19, 2020, Matrix received an invoice from Foley & Lardner, the law firm that Pitts hired in October 2019 to help him and Silagy set up the chain of entities that would allow FPL to fund political activity discretely in the 2020 election.  The invoice was discovered during a Matrix internal investigation in a folder labeled "FPL_2019_Vendor_Invoices."  It related to charges for work performed on behalf of Grow United, such as filing IRS submissions and annual reports in Delaware, as well as filings for Proclivity, Inc., Antithesis, Inc., and The Center for Advancement of Integrity and Justice – the entity controlled by Odom that Silagy had

previously used in connection with Mothers for Moderation in 2018.  According to Matrix records, the Foley & Lardner invoice was invoiced to FPL and listed as an "FPL_2019 Vendor Invoice"; the invoice was attached to the Matrix Memo.

269.     The ghost candidate scheme worked exactly as planned.  FPL's preferred candidate won each of the three races.  In District 37, Alex Rodriguez, a ghost candidate who shares Senator Jose Javier Rodriguez's last name (as well as a well-known former professional baseball player from South Florida), received over 6,000 votes despite doing nothing to campaign for himself. Senator Rodriguez was defeated by Ileana Garcia by only 32 votes out of over 210,000 cast in the election.  Meanwhile, FPL's ghost candidate Iannotti received 5,000 votes in District 9, but FPL's preferred candidate won that race by a 7,000-vote margin.

270.     The ghost candidate scheme came under the scrutiny of prosecutors in Miami-Dade County.  On March 18, 2021, Artiles surrendered to authorities, a day after police raided his home. He was charged with felony campaign finance violations, including conspiracy to make or receive illegal campaign contributions.

271.     The *Orlando Sentinel* reported on August 24, 2021, that Alex Rodriguez had pled guilty to accepting approximately $45,000 in bribes to run in the District 37 senate race.  Rodriguez agreed to three years of probation, including a year under house arrest wearing a GPS monitor, and to cooperate in the Artiles investigation.  Rodriguez, according to the Sentinel, "was struggling financially when [Sen. Frank] Artiles approached him [in 2020] and offered him $50,000 to file to run as an independent" in District 37's neck-and-neck race.

272.     On January 5, 2022, the *Orlando Sentinel* reported that several people and entities connected to the ghost candidate scandals, including Alvarado, Alexander, Newman, and LPAD, had received "prior to" letters from Miami-Dade prosecutors.  According to an interview with a

law professor at Florida International University, a "'prior to' letter from the State Attorney's Office typically alerts someone they are the target of an investigation and gives them a chance to sit for an interview with prosecutors." The story also stated that prosecutors had spoken with MacIver.

273.    According to the Securities Complaint, an email sent by the Miami-Dade State Attorney's Office to a Foley & Lardner attorney on July 12, 2021, billing records produced in response to a subpoena included "billing records between Foley & Lardner and Let's Preserve the American Dream," demonstrating that the same firm was representing LPAD and doing work for Matrix (work billed to FPL) to set up a funding structure for the 2020 elections.

274.    The *Orlando Sentinel* reported on May 25, 2022, that Iannotti, the District 9 ghost candidate, had been arrested and charged with multiple misdemeanors and a felony for her role in the scheme, including accepting an illegal $1,200 straw contribution.

> **d.    The 2020 Funding Structure for FPL's Spending with Matrix Was Designed to Evade Detection**

275.    On October 2022, CREW filed a complaint with the Federal Election Commission ("FEC"), asking the agency to investigate Grow United, the Center for Advancement of Integrity and Justice, Florida Promise, Broken Promises, Richard Alexander (Odom's brother), "Unknown Respondents," and several other entities and the persons listed as their chairs for violations of the Federal Election Campaign Act.

276.    The "Unknown Respondents," which CREW said "may include corporations like Florida Power & Light," were identified as the person or persons who were "the true sources of contributions [. . .] that were falsely attributed to conduit entities Grow United, the Center for Advancement of Integrity and Justice, Florida Promise, Broken Promises, and Stand Up for Justice." CREW's complaint, which only concerned five "federally registered super PACs" and

only concerned the 2020 election cycle, alleged that $1.27 million had been improperly funneled through five nonprofits and tied Matrix and Pitts to the super PACs.



277.    A chart in the CREW complaint depicted the flow of funds from the five Matrix-controlled entities to the five federally registered super PACs.  The chart showed which of these entities were mentioned in the memos sent to Defendant Silagy on November 26, 2019:

278.    CREW tracked contributions from the five Matrix-controlled entities to federal super PACs involved in federal elections using public records.

279.    On March 31, 2020, for example, Stand Up for Justice gave $50,000 to South Florida Residents First, a super PAC supporting a single candidate for a U.S. House of Representatives seat in Florida.  Stand Up for Justice was officially chaired by Pitts' longtime friend Anderson.

280.    On July 9, 2020, LPAD transferred $26,000 to Broken Promises, the entity nominally chaired by Pitts' longtime friend, Anderson, who also chaired other entities that Pitts assured FPL were "100percent" under Pitts' control.  Broken Promises donated $20,000 to Concerned Conservatives, Inc., a super PAC supporting a single candidate for a U.S. House of Representatives seat in Florida, five days later, on July 14, 2020.  The contribution was the super PAC's fourth largest in the 2020 election cycle.

281.    On October 27, 2020, Grow United contributed $100,000 to Wingman PAC, a super PAC that supports a single candidate for U.S. House of Representatives in Florida.  During the 2020 election cycle, Grow United contributed more than twice as much as the next highest contributor to Wingman PAC.

282.    Also on October 27, 2020, the Center for Advancement of Integrity and Justice contributed $100,000 to a super PAC supporting another U.S. House of Representatives seat in Florida, American Valor PAC.  This was the largest donation received by American Valor PAC, which spent $286,000 total during the 2020 election cycle.  Alexander registered the Center for Advancement of Integrity and Justice, but it was controlled by Odom and Matrix.

283.    On December 8, 2020, Florida Promise donated $1 million to the Senate Leadership Fund super PAC.  Alexander was the official chairperson of Florida Promise, but the entity was in fact controlled by Matrix, as evidenced by the memorandums sent to Defendant Silagy on November 26, 2019.

284.   According to the Securities Complaint, a ledger of contributions to the Senate Leadership Fund produced in response to a public records request filed by the Florida Center for Government Accountability with the Florida State Attorney's Office confirms that Florida Promise made a $1,000,000 contribution to the Senate Leadership Fund on December 8, 2020.

285.   FPL was the ultimate source of the funds that were improperly funneled through intermediaries to Super PACs for the express purpose of concealing the identity of FPL.

286.   To date, the "ghost candidate" scandal has resulted in multiple investigations, criminal prosecutions, and a conviction.  In exchange for agreeing to testify against Artiles, the former Florida state legislator with longstanding ties to FPL, Alex Rodriguez, the "ghost candidate" who ran in Florida Senate District 37, pleaded guilty to accepting two or more campaign contributions in excess of legal limits and a related conspiracy charge.  On September 30, 2024, a jury found Artiles guilty of three felony counts of campaign finance violations stemming from the scheme.[13]

### e.   Silagy Used Matrix to Gain Covert Control of an "Independent" News Website that FPL Used to Attack Competitors

287.   ████████████████   FPL and Matrix arranged for a Matrix-controlled entity to acquire control of a Florida-based news website called the *Capitolist*.  FPL and Matrix then used the *Capitolist* to publish articles supporting FPL and NextEra-backed priorities, such as rate hikes and the attempted acquisition of JEA, while also disparaging political opponents and media outlets that had reported unfavorably on the Company.

288.   The *Capitolist* bills itself as a digital news website focusing on "Florida business, policy, and politics."  It was founded in 2016 by Publisher and Editor-in-Chief Brian Burgess

---

[13]   Verdict Sheet, *Florida v. Artiles*, No. F-21-4768B (Fla. Cir. Ct. Sept. 30, 2024).

("Burgess").  Burgess was beholden to Matrix and FPL regarding site content between at least 2018 and 2021.  Articles posted on the *Capitolist* were pre-screened by Matrix personnel and frequently by FPL officers themselves, and a former FPL executive was formally brought in to oversee the site's content in September 2020.

289.    Silagy and Martell began demanding that the *Capitolist* publish stories attacking specific reporters and political candidates running for office as early as 2018, implying that FPL was effectively spending money on political advertising related to specific elections, just as it had with the mailers sent out in support of the ghost candidates.  And, as with the ghost candidate schemes, FPL funded and ran the *Capitolist* covertly, using intermediary "straw" entities controlled by Matrix to conceal its own involvement.  At one point, FPL even paid the salary of the ex-FPL executive hired to manage the *Capitolist* through SUN Marketing, the same entity conceived in November 2019 as the first link in the daisy chain for FPL funds to LPAD and political campaigns.

290.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████

291.     According to the *Miami Herald*, October 19, 2018, MacIver texted Martell a link to a *Capitolist* article critical of a proposal to allow utility customers to choose any electricity provider they wanted.  The title of the article was: "Can you hear me now?  Verizon hurricane troubles underscore danger of deregulating power companies."  MacIver texted Martell asking if he wanted to have the title "changed from specifically mentioning power companies?"  She later followed up: "Let me know if you're good."  Martell replied: "I think it's ok."  MacIver responded with a thumbs-up emoji and asked, "anywhere in particular you want me to target?"

292.     According to the *Miami Herald*, on November 3, 2018, three days before the 2018 election, Martell texted MacIver asking for the *Capitolist* to publish a piece critical of a gubernatorial candidate, Andrew Gillum.  Martell dictated that the article should state Gillum's campaigning had led him to neglect his duties as Mayor of Tallahassee.  Martell suggested language: "Since the primary xxx shootings have happened in Tallahassee."  Within three hours, the *Capitolist* published an article attacking Gillum.  The second sentence of the article implied Gillum was responsible for "a crime wave of murders, robberies and shootings in Tallahassee."  After MacIver texted him a link to the story, Martell ordered: "Promote the @&;$&!!! Out of this."

293.     According to the Securities Complaint, MacIver forwarded a proposed article by Burgess to Martell's personal gmail.com email address on March 8, 2019, with the subject line "Was about to publish [. . .] decided to ask you first."  Martell confirmed that he approved of the article.

294.     On April 1, 2019, Burgess published a story in the *Capitolist* titled "Documents suggest Florida's largest companies are secretly sabotaging effort to protect power lines from hurricane damage."  The story railed against what Burgess described as a "wealthy special interest

group" which he wrote was resisting "funding authorization needed for Florida's major utility companies" to protect Florida's electric grid.

295.     FPL evolved from sponsor to formal overseer of the *Capitolist* when, on September 20, 2019, MacIver executed a purchase option agreement with the *Capitolist* on behalf of Metis Group (the September 20, 2019, agreement amended an earlier version dated July 22, 2019).  In exchange for $50,000, Metis Group gained "executive control" over the *Capitolist* and a 1% ownership stake.  Metis Group also gained the option to buy a controlling 52% share in the *Capitolist* for $195,000 (minus the already paid $50,000).  The purchase option agreement is attached to the Matrix Memo.

296.     According to the Securities Complaint, a slide presentation later shared with Silagy in June 2020 stated that the purchase agreement granted Metis Group "executive oversight of Capitolist operations and functional legal control for the purpose of any branding or merger negotiations."  Metis Group was the site's primary sponsor, contributing more than $17,500 per month.

297.     According to the Securities Complaint, on Saturday, December 21, 2019, Martell texted MacIver a link to a story regarding allegations of ballot collection violations.  "Ok so now The Cap needs to weigh in.  ES asking," Martell wrote to MacIver.  On information and belief, "ES" stood for "Eric Silagy," whom Martell directly reported to at FPL and who was the only other FPL employee documents show had asked for particular *Capitolist* stories to be written.  MacIver responded, demonstrating the granular level of involvement Matrix and FPL exercised with respect to the *Capitolist*: "Ok can get that moving.  Do we want to wait until the lake county letter goes/confirmed has gone too and do a compilation of both/all the calls for action?"

298.     According to the *Miami Herald*, on April 16, 2020, Pitts forwarded an email message from Burgess to Silagy's personal Yahoo.com account and Martell's personal gmail.com account discussing an idea to buy additional news outlets "stealthily so we could inject content [. . .] and nobody needs to know who's pulling the strings[.]"  Pitts wrote to Silagy and Martell, describing the idea as "a good concept/observation."

299.     According to the Securities Complaint, on May 4, 2020, Silagy sent Pitts an email with the text of a *Miami Herald* "Giving Tuesday" fundraising column.  The *Herald*, and particularly its bureau chief Mary Ellen Klas, had previously brought negative attention to FPL through investigative reporting.  According to an August 2022 *Herald* story, Silagy was enraged by this reporting.  Silagy requested in an email to Pitts that the *Capitolist* "have a field day" with the *Herald*'s fundraising column, even suggesting that the *Capitolist* include "a cartoon of [Klas] with a tin cup on the street corner."

300.     Burgess emailed a draft story to MacIver and Richard Johnston of Public Concepts two days after Silagy's request, stating that the *Herald* was "now begging for handouts."  In the body of his email, Burgess wrote, "I plan to swap out the image for the suggestion Abbie [MacIver] made about [Klas] panhandling," but he had not had time to do so.  The message was forwarded to Pitts by MacIver.

301.     The next morning, May 7, 2020, on the same email thread, Pitts asked MacIver if there had been "any update on this," mentioning "I need to update ES on several issues."  The *Capitolist* posted a story that day, titled: "The Miami Herald has turned to begging to support their biased reporting and fear-mongering."  The story did not include a picture of Mary Ellen Klas panhandling but did include a picture of a sign reading "NO PANHANDLING ZONE."

302.    The same day, May 7, 2020, Burgess sent MacIver an email with the subject line "The MEK photoshop was too insensitive to beggars," attaching a photoshopped image of Klas begging for "[s]pare change" with a cardboard sign.  Burgess stated that the image would be used in an upcoming weekly newsletter.

303.    According to the *Miami Herald*, Burgess emailed MacIver on May 5, 2020, asking for "guidance" on whether he should report on a non-FPL utility that had, he claimed, cut off power to nearly 100 customers.  MacIver forwarded the message to Pitts, telling him that her "gut" feeling was to "let him" write the story because "it makes him look like he's not in our pocket and it isn't bad for FPL, especially if he highlights them being a good actor."

304.    According to the Securities Complaint, Tim Fitzpatrick ("Fitzpatrick"), a former FPL executive who had worked directly under Silagy for several years, was hired to oversee the *Capitolist*'s day-to-day operations.  According to a December 16, 2019, email from attorneys at Foley & Lardner to Fitzpatrick's personal email account, copying Pitts, Fitzpatrick was designated as the official owner and manager of SUN Marketing when it was incorporated in December 2019.

305.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

306.    According to the Securities Complaint, on June 9, 2020, MacIver sent a *Capitolist* slide deck to Pitts and Fitzpatrick in preparation for a meeting with Silagy.  Pitts emailed the slide deck to Silagy's personal Yahoo.com email account the next day.  On June 15, 2020, MacIver emailed Pitts and Fitzpatrick again, saying she thought Silagy had the slide deck and asking if the others wanted to have any "preparation discussions before the call with him."

307.    On June 10, 2020, Pitts sent Silagy a slide deck in which he stated that the *Capitolist*'s readership had "increased exponentially during our three-year investment period" beginning in March 2017, and discussed strategies and "the opportunity" to increase the *Capitolist*'s stature and visibility "to our benefit."

308.    On July 15, 2020, Pitts sent the slide deck to Silagy once more.  Silagy replied from his personal Yahoo.com email address: "Got it.  Thought you'd sent something new.  Thanks."

309.    ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

310.    According to the *Miami Herald*, in August 2020, Matrix arranged for the incorporation of a new entity called "Vision Insight Holdings" ("Vision") to give Fitzpatrick an official role from which he could oversee Burgess and have editorial control over the *Capitolist*'s stories.   According to the Securities Complaint, in Vision's August 30, 2020, Operating Agreement, MacIver was listed as the entity's sole director.  Matrix made arrangements for Vision to assume Metis Group's rights under the purchase option agreement.

311.    According to the Securities Complaint, Pitts and MacIver emailed Fitzpatrick in September 2020 with an official employment agreement with Vision.  Under the terms of the agreement, Vision would pay Fitzpatrick $15,000 per month.  Fitzpatrick and Pitts exchanged emails on September 4, 2020, in which he discussed his understanding that, under the agreement,

he would no longer receive his regular $5,000 per month from SUN Marketing and would instead be paid by Vision Insight Holdings.

312.    According to the Securities Complaint, on September 18, 2020, Fitzpatrick updated MacIver, Pitts, Burgess, and Richard Johnston of Public Concepts in an email about a meeting he had with Burgess earlier that day.  "Brian will be looping me into each days' plans for coverage and sending me articles before publication so I can comment as needed," Fitzpatrick wrote. Internal emails between Fitzpatrick and Burgess show that Fitzpatrick played an active role screening content for the site, including guest editorials.

313.    According to an analysis by the *Miami Herald* in an article titled: "Powerbrokers: How FPL secretly took over a Florida news site and used it to bash critics," published on July 25, 2022, and updated on August 13, 2022, after Fitzpatrick began overseeing the *Capitolist* in September 2020, "the number of headlines mentioning FPL and other energy-related topics more than doubled."

314.    According to the Securities Complaint, Fitzpatrick, on the other hand, became concerned in late 2020 that the *Capitolist*'s growing influence was a double-edged sword.  He believed that success and growth would inevitably raise questions about who was funding the site and pulling the strings behind the scenes.  In a December 8, 2020, email to Fitzpatrick, Burgess admitted that "pay to play" in media was generally considered "icky" by large corporations, who "definitely don't want it known they were engaged in that sort of behavior.  So, part of our challenge is to transform the perception that we're legit."

315.    According to the Securities Complaint, on December 20, 2020, Fitzpatrick sent an email to MacIver, which he designated "Confidential," outlining a plan preparing for "the day that could come" when media members began asking questions about the *Capitolist*'s sponsors.  "As a

tactical matter," Fitzpatrick wrote, "any reporter making an inquiry should be told 'put it in an email' and we will respond (or not, depending on the question) via email as per the draft answers below." Fitzpatrick wrote that the team would need to "ultimately mak[e] sure that our sponsors know that we will not deviate" from the predetermined answers to such questions. In response to the question: "Who is paying for this? Who owns you?" Fitzpatrick's script called for Burgess to respond that the *Capitolist* had a "variety of sponsors" and that "[a]s a matter of practice, we do not publicize our sponsors" because "publicizing their support leads to them receiving many new requests for sponsorships." In response to the question: "Isn't this just a 'Pay to Play' platform?" Fitzpatrick wrote: "No," then suggested turning the question around on the inquirer by asking: "Is the (name of the inquiring media outlet) a pay-to-play platform because you accept advertising dollars from businesses?" Fitzpatrick wrote that any other question he had not prepared an answer for should simply be ignored, "including any questions about ownership/management structure."

316.     According to the Securities Complaint, Silagy continued to be consulted on the *Capitolist*'s content. On August 27, 2020, Burgess sent a draft article to MacIver regarding JEA. The article asserted that the failure to sell JEA was due to "really bad management" by Jacksonville, which had "squander[ed]" an $11 billion opportunity. The article characterized NEE's $11.05 billion bid for JEA as "what should have been the winning bid." The sale, the article asserted, "could have been game changing" for Jacksonville, but there would now be "serious funding holes [. . .] well into the future." MacIver sent the draft to Pitts that same evening, who asked that the title and some of the wording be changed, but said he liked the story. MacIver asked Pitts two minutes later if they wanted to wait to receive feedback from Silagy ("es") before publishing. Pitts replied eight minutes later that MacIver could "[p]ut it up and just send me a link if he needs [to] edit we can change in the am."

317.    On August 28, 2020, the *Capitolist* published a story titled "How Politics Cost Jacksonville 11 Billion Dollars," which according to the Securities Complaint was largely similar in substance to the draft circulated the day before but included some new language (*e.g.*, "Had JEA been sold to NextEra, it would have netted the city more than $6 billion in profit" was changed to "Had JEA accepted the offer and sold to NextEra, it would have netted the city more than $6 billion in pure profit").  [Emphasis removed].

318.    According to the Securities Complaint, on October 12, 2020, MacIver emailed Martell's personal gmail.com address, asking if the *Capitolist* should run a story about a proposed solar energy project.  Fitzpatrick sent Burgess a NextEra press release on December 11, 2020, via email and wrote "[w]e should show them some love and do a little article on these accomplishments."

319.    According to the Securities Complaint, internal Matrix financial statements show that Vision continued to oversee and fund the *Capitolist* until at least 2021, contributing $200,000 between January and December 2021.  During this time, the site continued to publish stories favorable to FPL and NEE, including a July 27, 2021, story implying that a group seeking to oppose a proposed FPL rate hike was funded by dark money.

### 4.    Media Outlets Start Reporting on FPL's Ties to Matrix and the Ghost Candidate Scheme

320.    On December 2, 2021, the *Orlando Sentinel* published an article titled "Florida Power & Light Execs Worked Closely with Consultants Behind 'Ghost' Candidate Scheme, Records Reveal."  The article disclosed that the *Sentinel* had obtained documents, including "checks, bank statements, emails, text messages, invoices, internal ledgers, and more" that were "apparently unearthed during an internal investigation" by Matrix.  The article reported that documents showed that Matrix consultants billed FPL for more than $3 million shortly before they

began moving the money through Grow United that funded the ghost candidate scheme. The article also reported that the records also showed that Silagy coordinated with Matrix personnel on FPL campaign contributions that Matrix moved through various dark money non-profits – totaling more than $10 million.

321.    The *Sentinel* reported that Robo received the same records in early November 2021.

322.    On December 30, 2021, the *Sentinel* published another article detailing the ghost candidate scheme. In it, the *Sentinel* again explained that its reporting was based on documents that had been delivered to the paper, including checks, bank statements, emails, text messages, invoices, ledgers, and other documents involving Matrix and FPL and covering the period between 2016 and 2020.

323.    Over the next eight months, Florida newspapers published more than a dozen articles linking FPL and NextEra to the ghost candidate schemes, the *Capitolist*, journalist surveillance, and JEA impropriety. These stories frequently drew on internal Matrix documents obtained by the press.

324.    On December 17, 2021, Defendant Reuter told the *Orlando Sentinel* that the Matrix Memo was "shared with us" and that he and others were thus aware of the funding structure described in the memos sent to Silagy on November 26, 2019.

### C.    Defendants' Violations of Securities Laws

325.    From at least December 2, 2021 through January 31, 2023, certain Defendants made and caused NextEra and FPL to make false and misleading statements and omissions regarding the above. Broadly, these statements and omissions can be put in two categories: (1) affirmative statements denying or minimizing the role of NextEra and FPL in the above schemes, and (2) omissions in SEC filings about the impact of the above schemes on NextEra and FPL.

### 1.   Affirmative Misstatements

326.   On December 2, 2021, in response to the *Orlando Sentinel*'s reporting, Reuter denied the Company had any role in the ghost candidate scheme:

> Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle.  Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

327.   On December 10, 2021, in response to questions by the *Orlando Sentinel* and *Florida Times-Union* about the creation of Grow United, Reuter said that "FPL had no involvement in the creation of Grow United," and further: "Over this past summer, through both questioning from media and our own subsequent investigation, we learned that Joe Perkins' team was responsible for the origins of this non-profit.  As we understand it, Mr. Perkins had another client based out of Denver who was advocating nationally for the legalization of marijuana.  Grow United was created for that client, who expressed interest in setting up offices in Georgia, Florida and Alabama."

328.   On December 17, 2021, when asked by the *Orlando Sentinel* about the November 26, 2019, Funding Memo and Legal Memo that Pitts sent to Silagy proposing a structure for FPL's political campaign spending that would "minimize public reporting," Reuter said, "we have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle, and further: "Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501(c)(4) organizations and we had no knowledge of this structure being used by Matrix.  We are aware of the proposed structure as the legal memo was shared with us, and as we understand it, Joe Perkins' team at Matrix created a proposal to fund their clients' communication and outreach activities during 2020."

329. On December 10, 2021, when asked about the job offer extended to Garrett Dennis, Reuter, serving as FPL's spokesman, said: "In July 2019, a Matrix representative working for Joe Perkins approached FPL about a plan to offer Garrett Dennis a job working to decriminalize marijuana. FPL flatly rejected the plan and communicated our lack of interest to Joe Perkins' team."

330. On January 25, 2022, Robo made the following statement on a call with investors and analysts:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When we got – when we received the report and those allegations that have been in the press, we conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company e-mails, also looking at their – they've all provided access to their personal e-mails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. And so that's kind of the bottom line. And I feel very good about the investigation that we did, and I feel very good that there is no basis to any of these allegations[.]

331. On June 24, 2022, when asked by the *Orlando Sentinel* and *Florida Times-Union* about FPL's alleged covert monitoring of *Florida Times-Union* journalist Nate Monroe, Silagy responded in an interview with reporters, including Monroe, "[w]e did not engage in any activities having to do with following people like you, Nate, or taking pictures."

332. That same day, when the *Orlando Sentinel* presented Reuter with text messages and emails indicating that a private investigator paid by Matrix had followed Monroe while updating Martell on the pursuit, Reuter made a statement casting doubt on the authenticity and completeness of the records, saying FPL had "no digital record of these exchanges and cannot prove their veracity" and "[t]aken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing by FPL or our employees."

333.    On August 13, 2022, the *Miami Herald* reported on FPL's apparent control over the *Capitolist*.  In response to questions about the *Capitolist*, Chris McGrath, at the time serving as a spokesperson for FPL in his role as Communication Leader – Corporate Affairs, told the *Herald*: "FPL does not have an ownership interest in the Capitolist – either directly or indirectly[. . . .]  We also do not have editorial control over what the Capitolist writes or publishes."

### 2.    Omissions in SEC Filings

334.    On February 18, 2022, NextEra filed its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating performance for the year ended December 31, 2021 ("2021 10-K").  The 2021 10-K was signed by Defendants Robo, Barrat, Camaren, Dunn, Gursahaney, Hachigian, Lane, Porges, Schupp, Skolds, Utter, and Wilson.  The 2021 10-K failed to disclose any risk to investors that NextEra might be negatively impacted by the investigations into allegations that FPL or NextEra had violated or abetted violations of federal, state, or local election laws.

335.    On April 1, 2022, NextEra filed its annual proxy statement with the SEC on Schedule 14A (the "2022 Proxy Statement").  The 2022 Proxy Statement solicited shareholder votes in favor of five proposals, including the re-election of Defendants Barrat, Camaren, Dunn, Gursahaney, Hachigian, Ketchum, Lane, Porges, Robo, Schupp, Skolds, Stall, and Wilson (*i.e.*, the "Proxy Defendants"), as well as non-binding approval of certain executive compensation.

336.    The 2022 Proxy Statement includes several representations designed to bolster arguments in favor of those propositions, including that:  (1) NextEra had adopted a Code of Business Conduct & Ethics applicable to all representatives of NextEra Energy and its subsidiaries, including directors; (2) the "Board has instructed the General Counsel to assist the Board in reviewing all written communications" regarding, among other things, any internal and external

complaints, including as they relate to Company subsidiaries; and (3) the Audit Committee oversees compliance with legal and regulatory requirements as well as "major risks" to the Company.

337.    The 2022 Proxy Statement requested that shareholders to ratify certain executive compensation awards, including to Defendants Robo, Silagy, and Ketchum.  In an effort to justify these awards to shareholders, the 2022 Proxy Statement represented that "in years where the Company's performance is above or substantially above the performance of its peers [. . .] as it was in 2021, the Company expects that annual incentive awards will be paid [. . .] at a rate exceeding the target rate."

338.    The 2022 Proxy Statement, however, failed to disclose the governance failures which had already led to multiple instances of unlawful or unethical Company behavior, exposing NextEra to financial and reputational harm, and that the Board had insufficient policies and procedures to uncover and remedy such behavior.

339.    The 2022 Proxy Statement also was false and misleading because it failed to disclose that, despite the representations in the 2022 Proxy Statement regarding the Board's risk oversight function and the Audit Committee's responsibilities, the Board and committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements regarding the Matrix Memo and the Company's response and exposure resulting therefrom.

340.    The false and misleading representations and omissions in the 2022 Proxy Statement were material to shareholders voting on the Board's proposals, particularly with respect to the reelection of incumbent directors and the approval of executive compensation.

341.     On April 22, 2022, NextEra filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending March 31, 2022 ("2022 Q1 Form 10-Q").  The 2022 Q1 Form 10-Q was certified by, among others, Defendants Ketchum and Silagy.  The 2022 Q1 Form 10-Q failed to disclose any risk to investors that NextEra might be negatively impacted by the investigations into allegations that FPL or NextEra had violated or abetted violations of federal, state, or local election laws.

342.     On July 27, 2022, NextEra filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending June 30, 2022 ("2022 Q2 Form 10-Q").  The 2022 Q2 Form 10-Q was certified by, among others, Defendants Ketchum and Silagy.  The 2022 Q2 Form 10-Q failed to disclose any risk to investors that NextEra might be negatively impacted by the investigations into allegations that FPL or NextEra had violated or abetted violations of federal, state, or local election laws.

343.     On November 3, 2022, NextEra filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending September 30, 2022 ("2022 Q3 Form 10-Q").  The 2022 Q3 Form 10-Q was certified by, among others, Defendants Ketchum and Silagy.  The 2022 Q3 Form 10-Q failed to disclose any risk to investors that NextEra might be negatively impacted by the investigations into allegations that FPL or NextEra had violated or abetted violations of federal, state, or local election laws.

### 3.     The Truth Emerges and Subsequent Developments

344.     On January 25, 2023, NextEra filed a Form 8-K with the SEC which for the first time specifically acknowledged that FPL faced legal and reputational risks because of the allegations that FPL executives may have orchestrated political misconduct.  The Form 8-K stated:

> Allegations of violations of law by FPL or NEE have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for

FPL and NEE, and could hamper FPL's and NEE's effectiveness in interacting with governmental authorities.

FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL[. . . .] FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred. In addition, notwithstanding the completion or pendency of any internal review or investigation by FPL or NEE of any allegations of legal violations, including of the allegations regarding campaign finance laws set forth in the media articles or FEC complaint, FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE, or will not have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities.

345.    On the same day, January 25, 2023, NextEra filed a second Form 8-K disclosing that Silagy would no longer serve as CEO of FPL as of February 15, 2023, and would retire effective May 15, 2023.

346.    In an exhibit attached to the Form 8-K, NextEra additionally disclosed a "Confirmation of Post-Retirement Covenants Agreement" (the "Severance Agreement") between NextEra and Silagy, whereby Silagy agreed to, among other things, a release of claims and various restrictive covenants, including non-competition and non-disparagement covenants, in exchange for payments in the form of incentive awards calculated in accordance with NextEra's annual incentive plan and equity awards consistent with what was characterized as "a normal retirement" of an employee at least age 55 following at least 10 years of service.

347.    The Severance Agreement included a clawback provision, whereby Silagy agreed to repay to NextEra nearly all the amounts granted to him under the Severance Agreement, should

Silagy be convicted of or plead guilty or *nolo contendere* to, or admit to facts constituting, a felony in violation of state or federal laws, or if another NextEra employee does likewise, based on actions that Silagy participated in, or was or should have been aware of during his tenure. Notably, the Severance Agreement provides no clawback whatsoever for anything less than felony culpability by Silagy. Civil liability (including of federal securities laws) or breaches of the Company's own ethical standards are not actionable under the Severance Agreement.

348.   On January 25, 2023, on a call with investors and analysts, in response to a question about whether there was a link between NextEra's internal investigation of potential political misconduct and Silagy's departure, NextEra CEO John Ketchum deflected by saying "we're not making a connection" but acknowledged "it's a little earlier than I would have hoped Eric would have wanted to do it."

349.   Stock market analyst Paul Patterson of Glenrock Associates wrote that NEE's stock price decline on January 25, 2021, was "driven substantially by the unexpected management change and the update they gave on their review into political activity." On January 27, 2023, the *South Florida Sun Sentinel* reported on the 8-K's discussion of the FEC Complaint,[14] writing that it "was a tacit admission that $1.3 million from FPL went into the dark money pipeline."

350.   Additional factors bolster Silagy's knowledge of, and participation in, the scheme. First, Silagy's claim that the Company had never been subpoenaed over its involvement in the JEA scandal was false when made. During a May 15, 2023 hearing in the case against JEA's former CEO and Chief Financial Officer, the government showed and published a copy of an April 21, 2020 subpoena sent to NextEra regarding the JEA scandal. FBI agent Robert Blythe explained to

---

[14]   The "FEC Complaint" refers to the complaint filed by the FEC in *In the Matter of Unknown Respondents*, MUR 8082, on October 27, 2022.

the court that NextEra not only provided a document production in response to the subpoena but made certain employees available for interviews with the government – including Silagy. Silagy's falsehood regarding the JEA subpoena raises the inference that he further knew or recklessly disregarded that his statements at issue in this case were untrue.

351.    Second, on December 1, 2021 – one day before the initial reporting on the Matrix Memo was published – Silagy sold 62,480 shares of personally held NEE stock at a price of $87 per share, representing a total value of $5,435,760. Both the timing and the amount of the stock sold by Silagy were unusual and suspicious. On December 1, 2021, Silagy would have known that a potentially negative news story linking FPL to the conduct of Matrix and the "ghost candidate" scandal was imminent as he had been asked to provide quotes in response to specific questions about the content of the story. The 62,480 shares of NextEra stock sold by Silagy on December 1, 2021, represent the largest volume of shares bought or sold in a single day of trading throughout his tenure as an officer of FPL going back to November of 2012.

352.    On September 29, 2023, the General Counsel for the FEC submitted their factual and legal analysis of the FEC Complaint in an initial 48-page report to the Commission (the "General Counsel Report").[15] In the report, the General Counsel determined that, based on the allegations in the FEC Complaint, there was reason to believe that the Unknown Respondents had violated 52 U.S.C. §30122 and 11 C.F.R. §110.4(b) by making contributions in the name of another, and that Grow United and four other 501(c)(4)s violated the same by knowingly permitting their names to be used to effect such contributions, and recommended that the FEC investigate the matter fully. General Counsel Report at 41. The General Counsel did not

---

[15]    FED,    First    General    Counsel's    Report    (Sept.    29,    2023), https://www.fec.gov/files/legal/murs/8082/8082_51.pdf.

recommend taking action against FPL at that time, based in part on Silagy's sworn statement that FPL did not use any FPL funds to make conduit contributions through nonprofit organizations in 2020. *Id.* at 41-42.

353.    Far from absolving FPL and Silagy, however, the General Counsel Report pointedly noted that Silagy's sworn statement was limited to 2020 and did not reach the alleged payments to nonprofits by FPL in the 2018 cycle.   The report found that FPL appeared to have funded such groups prior to 2020, may have been one of the sources of the relevant contributions, and that FPL implemented at least part of Matrix's proposed scheme.  *Id.* at 42.

354.    On February 8, 2024, the FEC failed on a 2-3 vote (with one absence) to accept the General Counsel's recommendations.   On February 27, 2024, the FEC failed on a 3-3 vote to dismiss the FEC Complaint, voting to close the file.   That FPL was one vote away from an FEC full-blown investigation, coupled with the extensive analysis of the General Counsel Report, shows that FPL's participation in the scheme was credible.

### 4.    Securities Damages to NextEra

355.    From December 1, 2021, through January 31, 2023, NextEra repurchased its own common stock as follows:

| Period | # of Shares Repurchased | Average Price Per Share | Cost |
|---|---|---|---|
| Dec. 2021 | 1,306 | 90.78 | 118,558.68 |
| Feb. 2022 | 222,996 | 75.38 | 16,809,438.48 |
| Mar. 2022 | 1,618 | 81.22 | 131,413.96 |
| May 2022 | 8,056 | 69.80 | 562,308.80 |
| June 2022 | 1,804 | 73.20 | 132,052.80 |

| July 2022 | 164 | 80.25 | 13,161.00 |
| Aug. 2022 | 7,870 | 91.00 | 716,170.00 |
| Sept. 2022 | 1,554 | 85.50 | 132,867.00 |
| Nov. 2022 | 6,819 | 82.91 | 565,363.29 |
| Dec. 2022 | 1,549 | 86.21 | 133,539.29 |
| **Total** | 253,736 | 76.12 | 19,314,873.30 |

356.    By repurchasing shares while the price was artificially inflated, NextEra was harmed.

## VI.    BOARD KNOWLEDGE AND CULPABILITY

357.    Confidential internal Board-level documents produced to Plaintiff show that, despite the vital importance of political engagement to the bottom line of FPL and NextEra, the Board failed to put in place or enforce an adequate governance regime to discourage or root out the kind of below-board political dirty tricks evidenced in the Matrix Memo and the Maine/NECEC affair and extensively reported on by the media. ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

358.    ██████████████████████████████████████

████████████████████████████████████████████████



359.

360.

361. 

362.

363.

364.

365.

366.



367.

368.

369.

370.

371.



372.

373.

374.



375. ████████████████████████████████

376. ████████████████████████████████

377. ████████████████████████████████

378. ████████████████████████████████



380.    Counsel for Plaintiff requested all additional responsive Board materials through June 2023, and was informed by counsel for the Company that no further documents existed.

381.    Despite Plaintiff's demand for Board materials regarding: 1) NextEra's contributions to 501(c)(4), "dark money," or other political organizations, including Matrix LLC; 2) the Company's lobbying or political contributions and campaign disclosures, policies, procedures, or practices; and 3) controls in place to monitor, prevent, or report up allegations of improper political influence, ███████████████████████████████████████ ███████████████████████████████████. This indicates a completely inadequate system to detect, prevent, or remediate any such legal or ethical violations, and a major breach of the Board's oversight functions.

382.    Further, there is no evidence in the Books and Records that the Board took any action to discipline any Company employees involved in the campaign finance schemes in Florida or Maine.  Silagy, in fact, was granted a generous Severance Agreement by the Board with no clawback provision for anything less than felony criminal liability.

## VII.    DAMAGES TO THE COMPANY

383.    As a result of the Individual Defendants' knowing misconduct, NextEra engaged in unlawful and deceptive schemes of obstructing the lawful NECEC project and funding shadow non-profit organizations to impermissibly further NextEra's business objectives.   NextEra participated in violations of antitrust and competition law, campaign financing law and its own internal policies by engaging in unlawful restraint of trade, and intentionally hiding political contributions to influence elections and policy decisions, to its own detriment and the detriment of its shareholders.

384.    Further, as a direct and proximate result of the Individual Defendants' actions, NextEra has expended, and will continue to expend, significant sums of money in relation to wrongdoing – defending suits, such as the Antitrust Action and Securities Action, responding to governmental investigations, and spending large sums of capital on marketing campaigns to win back the good faith of its customers.

385.    Finally, NextEra's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's engagement in the above-described behaviors.

## VIII.   DERIVATIVE ALLEGATIONS

386.    Plaintiff brings this action derivatively in the right of, and for the benefit of, NextEra to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

387.    Plaintiff will adequately and fairly represent the interests of NextEra and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action.  Plaintiff has continuously held NextEra

stock since May 5, 2022, and will continue to hold NextEra stock through the resolution of this action.

## IX.    DEMAND FUTILITY ALLEGATIONS

388.    Plaintiff has not made a demand on the Board to bring the claims asserted herein because doing so would be a futile and useless act.  The Current Director Defendants (Ketchum, Arnaboldi, Camaren, Gursahaney, Hachigian, Lane, Porges, Stall, and Wilson) constitute nine of the 13 current directors on the Board.  As set forth below, there is no majority of the Board capable of making an independent and disinterested decision to consider the Demand with respect to any of the claims brought by Plaintiff.

389.    Each of the Current Director Defendants faces a substantial likelihood of liability for breaching their duty of loyalty to NextEra by failing to ensure that NextEra had sufficient internal controls regarding (1) following federal, state, and local laws as well as the Company's own internal policies regarding political funding; and (2) making sure that the Company's public representations were free from materially misleading statements and omissions.

390.    Each of the Current Director Defendants (save Arnaboldi and Ketchum) was on the Board prior to receipt of ███████████████, during which time they utterly failed to implement or oversee a system of internal controls that would have prevented the behavior described in the Matrix Memo and subsequent media reporting, despite the importance to NextEra of lawfully and ethically participating in the political process.

391.    Each of the Current Director Defendants (save Arnaboldi and Ketchum) was on the Board ████████████████████████████████████████████████████████████████████████████████████. In addition, Arnaboldi was aware of the issues in the Matrix Memo and subsequent media reporting

no later than ███████████████████████████. Each Current Director Defendant was thus on notice of the potential violations of federal, state, and local election laws, as well as NextEra's company policies described therein.

392.    Despite this, the Current Director Defendants have refused to take sufficient action against Silagy or any other Company employee for violations of federal, state, or local election laws or the Company's policies.

393.    Each of the Current Director Defendants was on the Board after they were aware that Defendants Robo, Silagy, and/or Reuter made false or misleading public statements regarding the facts underpinning the Matrix Memo and the Company's response and potential exposure thereto.

394.    Despite this, the Current Director Defendants have refused to take sufficient action against Robo, Silagy, or Reuter for violations of federal securities laws or the Company's policies.

395.    Defendant Ketchum has additional reasons why he cannot disinterestedly consider the Demand.  Ketchum has been president and CEO of NextEra since March 2022 and Chairman of FPL since February 2023.  In its proxy dated April 1, 2024, NextEra acknowledges that Ketchum is not independent.  The proxy further states that Ketchum received a salary of $1.4 million in 2021, $1.483 million in 2022, and $1.575 million in 2023.  In 2023 alone, Ketchum's salary plus other compensation totaled over $20.5 million.

396.    Ketchum also faces a substantial likelihood of liability for breaching his fiduciary duties of loyalty *and* care as an officer of NextEra.  In addition to his culpable actions and inactions after he succeeded to the Board, Ketchum faces liability because he was President and CEO of NEER during much of the period when NEER was surreptitiously funding the anti-NECEC

campaign, abdicating his duty to exercise NEER operated in accordance with federal and state laws and regulations.

## X.  CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### Against the Individual Defendants

397.  Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶1-396 as if fully set forth herein.

398.  The Individual Defendants each owe (and owed) NextEra and its shareholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

399.  The fiduciary duties the Individual Defendants owed to NextEra included, among others, implementing and overseeing a system of internal controls to (1) monitor, detect, prevent, and remediate the unlawful anticompetitive behavior of its principal subsidiaries; (2) monitor, detect, prevent, and remediate the unethical or unlawful practice of surreptitiously funding 501(c)(4) organizations to anonymously participate in political processes; and (3) monitor, detect, prevent, and remediate the dissemination of false and misleading statements to the public.  The Individual Defendants also had a duty to implement remedial measures upon the violations relating to the above.

400.  As detailed above, the Individual Defendants breached their fiduciary duties by:

a.  despite knowing the importance of following applicable laws and regulations and the Company's own policies regarding (1) abstaining from anti-competitive behavior and (2) participation in the political process, they consciously and repeatedly failed to ensure that NextEra's reporting systems were adequately

designed to detect (1) unlawful interference in the NECEC project and (2) unlawful or unethical funding of nonprofits to evade identification of NextEra and its subsidiaries as the source of funds;

b.  consciously disregarding their duty to investigate red flags and remedy any misconduct discovered; and

c.  issuing false and misleading statements to stockholders.

401.  The Individual Defendants had actual or constructive knowledge that they caused the Company to fail to maintain adequate internal controls and failed to provide adequate oversight to protect the Company from liability related to the Company's unlawful or unethical practices regarding (1) anticompetitive behavior and (2) political engagement.

402.  These actions were not good-faith exercises of prudent business judgment to protect and promote the Company's corporate interests and those of its stockholders.

403.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, NextEra has been damaged, not only monetarily, but also with regard to its corporate image and goodwill.  Such damages to NextEra include, and will include, substantial risk of liability, legal costs, increased regulatory scrutiny, reputational damages, declining customer base, declining revenue, declining stock price, increased cost of capital, and other costs, damages, and liabilities.

## COUNT II
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Individual Defendants

404.  Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶1-396 as if fully set forth herein.

405. During the relevant period, Defendants disseminated or approved false or misleading statements about NextEra related to its political engagement regime, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

406. At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase more than $19 million of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.

407. Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon NextEra in connection with the Company's purchases of its own common stock during the relevant period.

408. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of NextEra stock, which were intended to, and did: (a) deceive NextEra regarding, among other

things, the Company's lack of internal controls to monitor, detect, and prevent unlawful or unethical political engagement practices; and (b) artificially inflate and maintain the market price of NextEra stock.

409.    Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the relevant period, as alleged above.

410.    As described above, Defendants acted with scienter throughout the relevant period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.  The misstatements and omissions of material facts set forth in this complaint were either known to Defendants or were so obvious that Defendants should have been aware of them.  Throughout the relevant period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

411.    As a direct and proximate result of Defendants' wrongful conduct, NextEra suffered damages in connection with its purchases of its own common stock during the relevant period.  By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT III**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

412.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶1-396 as if fully set forth herein.

413.    During their tenures as officers and/or directors of NextEra, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of

NextEra, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by NextEra, including its materially misleading 2022 Proxy Statement and other filings with the SEC, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

414.    As set forth above, NextEra violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons of NextEra and, as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of NextEra, each of the Individual Defendants was culpable for the material misstatements and omissions made by NextEra as set forth above.

**COUNT IV**
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**Against the Proxy Defendants**

415.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶1-396 as if fully set forth herein.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Proxy Defendants.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to this claim.  In addition, NextEra's exculpation provision in its Articles of Incorporation is inapplicable to this derivative claim because such provision only applies to breach of fiduciary claims and has no application to federal

securities laws.  Further, this Count is asserted as a derivative claim on behalf of the Company by
the Plaintiff, and not as a direct claim on behalf of shareholders.

416.    SEC Rule 14a-9 (17 C.F.R. §240.14a-9), promulgated under Section 14(a) of the
Exchange Act provides:

> No solicitation subject to this regulation shall be made by means of any proxy
> statement, form of proxy, notice of meeting or other communication, written or
> oral, containing any statement which, at the time and in the light of the
> circumstances under which it is made, is false or misleading with respect to any
> material fact, or which omits to state any material fact necessary in order to make
> the statements therein not false or misleading or necessary to correct any statement
> in any earlier communication with respect to the solicitation of a proxy for the same
> meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

417.    The Proxy Defendants either knowingly or negligently issued, caused to be issued,
and participated in the issuance of materially false and misleading written statements to
stockholders that were contained in the 2022 Proxy Statement.  The 2022 Proxy Statement
contained proposals to NextEra's stockholders urging them to re-elect the members of the Board
and approve executive compensation.  The 2022 Proxy Statement, however, misstated or failed to
disclose: (1) deficiencies in NextEra's internal and disclosure controls that were known to the
Proxy Defendants when the 2022 Proxy Statement was filed; and (2) reporting failures known to
the Proxy Defendants when the 2022 Proxy Statement was filed, regarding NextEra's political
engagement regime.

418.    By virtue of the conduct alleged herein, the Proxy Defendants violated Section
14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Proxy
Defendants' wrongful conduct, NextEra misled or deceived its shareholders by making misleading
statements that were an essential link in a majority of those shareholders deciding to follow

NextEra's recommendation to re-elect those directors, and approve certain executive compensation.

419.    Plaintiff, on behalf of NextEra, seeks relief for damages inflicted on the Company due to the misleading 2022 Proxy Statement in connection with the improper re-election of the members of the Board and approval of executive compensation.

**COUNT V**
**Aiding and Abetting Breach of Fiduciary Duties Against Matrix**

420.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶1-396 as if fully set forth herein.

421.    As alleged above in Count I, each of the Individual Defendants had, and breached, fiduciary duties they held toward NextEra and its shareholders.

422.    Matrix, through its control persons, had knowledge of those breaches.  By offering substantial assistance and encouragement to the Individual Defendants to take the above-referenced wrongful actions in breach of their fiduciary duties, Matrix aided and abetted the Individual Defendants in those breaches.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of NextEra and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to NextEra;

C.    Determining and awarding to NextEra the damages sustained by it, as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally;

D.      Awarding to NextEra restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them, including all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards, or stock option grants), and common stock sale proceeds;

E.      Directing NextEra to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees;

G.      Awarding pre- and post-judgment interest; and

H.      Granting such other and further relief as the Court deems just and equitable.

## XII.    JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: February 21, 2025                  Respectfully submitted,

**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT P.A.**

/s/ *Jeff Ostrow*
Jeff Ostrow (Florida Bar No. 121452)
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
ostrow@kolawyers.com

*Local Counsel for Plaintiff*

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**

Joseph A. Pettigrew (*pro hac vice* admitted)
*Of Counsel*
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jpettigrew@scott-scott.com

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
Jing-Li Yu (*pro hac vice* admitted)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
jyu@scott-scott.com

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
Geoffrey M. Johnson (*pro hac vice* forthcoming)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (216) 229-6092
gjohnson@scott-scott.com

*Additional Counsel for Plaintiff*

## **VERIFICATION**

I, JEFF KUSMIERSKI, hereby declare as follows:

1.      I am the derivative plaintiff in this action.  I verify that I have reviewed the Verified Stockholder Amended Derivative Complaint (the "Amended Complaint") to be filed in this action and that the facts stated in the Amended Complaint, as they concern me, are true to my personal knowledge.  I believe the facts pleaded in the Amended Complaint on information and belief or investigation of counsel are true.

2.      I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to me; or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 20 day of DECEMBER , 2024.

_____
JEFF KUSMIERSKI
Plaintiff

STATE OF F-LORIDA )
                                    ) ss
COUNTY OF Lee )

Subscribed and sworn to (or affirmed) before me, the undersigned Notary Public, on this 20 day of December , 2024, personally appeared JEFF KUSMIERSKI , proved to me on the basis of satisfactory evidence to be the person who signed the preceding document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge or belief.

_____
Notary Public
My commission expires: 9/5/2027

Notary Public State of Florida
Steven L. Somsen
My Commission HH 440711
Expires 9/5/2027